**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JANE DOE,<br>ADDRESS UNDER SEAL;<br><br>Plaintiff,<br><br>v.<br><br>JOHN ROE,<br>ADDRESS UNDER SEAL; and<br><br>CATHOLIC UNIVERSITY OF AMERICA,<br>Matthew Dolan, REGISTERED AGENT<br>620 Michigan Avenue, NE<br>Washington, DC 20064;<br><br>Defendants. | ) | Case No. 1:25-cv-02978-RJL |

## COMPLAINT

Plaintiff Jane Doe ("Plaintiff"), by and through counsel, complains as follows.

## NATURE OF THE CASE

1. On the night of October 18-19, 2024 Plaintiff, an eighteen-year-old woman beginning college at the Catholic University of America (the "University" or "Catholic University"), suffered the same violence inflicted on too many of her predecessors. Photographs, videos, and witnesses communicate a picture of a slight young woman inebriated from using alcohol and marijuana on University properties, but uninjured, as she heads to the school's "rugby house."

2. Plaintiff was at the rugby house party to meet Defendant John Roe ("Defendant Roe"), a football player who had invited Plaintiff to the party. Plaintiff, already intoxicated, consumed multiple alcoholic drinks that Defendant Roe prepared or obtained for her. Meanwhile, Defendant Roe remained sober. Around midnight, Defendant Roe escorted Plaintiff back from the party, past a school employee, and into the male athlete's dormitory—arriving around 12:05 AM.

Defendant Roe did not sign Plaintiff in as a guest. In his friend's room across the hall, Defendant Roe served Plaintiff still more liquor before leading her across the hall into Defendant Roe's room. While Plaintiff was intoxicated, and without her consent, Defendant Roe vaginally, anally, and orally raped Plaintiff while strangling her and holding her down.

3. While prohibited by University policy, and, in the case of underage drinking and sex crimes, prohibited by federal law, in practice the University knowingly tolerates underage and excessive drinking, drug use, and late night visits by young women to male athletes' dormitory rooms—predictably, tragically, and ultimately leading to sexual offenses that could and ought to have been prevented.

4. Plaintiff immediately told at least six outcry witnesses that she had just been raped. Photographs and witnesses communicate a picture of a slight young woman now severely bruised from a violent assault by a much larger man. Defendant Roe soon direct-messaged Plaintiff via social media, asking "Are you good?" Plaintiff instantly blocked Defendant Roe from further communication.

5. The University's Title IX board found, quite reasonably, that Defendant Roe raped Plaintiff. The board did so on the basis of photos of Plaintiff's bruises, medical records of her pain, her swift blocking of Defendant Roe on social media, outcry witnesses' testimony, and other witnesses' observations of changes in her personality after the assault. In contrast, the board noted Defendant Roe's flat affect, and their incredulity about his testimony, and his lack of character witnesses.

6. Subsequently Lawrence Morris, the chief of staff and counsel to the University's president, unilaterally overturned the Title IX board's decision. Mr. Morris—an attorney and former colleague of Defendant Roe's counsel—claimed that he did so on grounds of newly-

obtained hearsay statements that Plaintiff allegedly had anal sex on October 15, 2024. Even if true, which it is not, this evidence would not explain injuries, including excessive bruising, invisible on October 18, 2024 and suddenly materializing on Plaintiff's neck and arm on October 19, 2024. Mr. Morris further purported to disbelieve Plaintiff's testimony about the lack of DNA evidence against Defendant Roe, even though in her distress (and upon the suggestion of the treating nurse) she had declined relevant but highly invasive exams, and her assailant wore a condom. Mr. Morris further allegedly relied upon witnesses' post-hearing statements about Plaintiff's inconsistencies regarding minor details of the events in question, and the board's procedurally incorrect reliance upon the Defendant Roe's lack of any character witness to overturn the board's decision to expel Defendant Roe.

7. In addition to his arbitrary and capricious evaluation of the facts, Mr. Morris failed to follow the University's established procedures for appealing Title IX grievances. Upon information and belief, the existing policy at Catholic University allowed respondents in sexual grievance proceedings to appeal the findings of the hearing board on two possible bases: significant procedural error that changes the findings of fact of the student conduct proceeding, or new evidence that significantly alters the findings of fact, which was previously unknown to the respondent, has been discovered, and is available during the appeal process. The policy goes on to state that the appellate agent:

> shall not gather additional evidence or speak to any of the individuals who provided evidence or testimony at the hearing. If the appeal agent believes that new evidence, previously unknown to either party, significantly alters the finding of fact, the case may be returned to the original Board or, at his/her sole discretion, a Board with some or all new members, to hear more evidence. Such hearing shall occur in the presence of the complainant and respondent when possible. The appeal agent may not return the case to the Board only for the purpose of reconsidering its original decision.

8. In unilaterally overturning the original hearing board's determination, Mr. Morris either gathered and considered new evidence without referring the case for a re-hearing or considered an appeal based on evidence already considered by the original hearing board (and therefore not new). Mr. Morris's contravention of University policy deprived Plaintiff of due process and an equitable hearing of her grievance. Further, Mr. Morris's arbitrary and capricious reasoning reflected an overly and unreasonably generous preference of the male respondent, Defendant Roe—who remains a student enrolled at the University.

9. In reality, Mr. Morris, on behalf of the University, wrongfully overturned the board's decision because there is a history of litigation, which is especially embarrassing for a parochial school, regarding male Catholic University athletes sexually assaulting inebriated female freshmen.

10. Defendant Roe is liable at common law for assault, battery, and intentional infliction of emotional distress for strangling and raping Plaintiff while overcoming her resistance by force. But beyond that, Title IX provides that no American woman shall be denied the benefits of educational programs receiving federal assistance on the basis of her sex.[1] The University knew prior to Plaintiff's sexual assault that its failure to maintain or observe adequate policies and procedures made inebriated female students vulnerable to on-campus rapes by male athletes. The University, through its administrators, demonstrated deliberate indifference to sexual abuse, which deprived female students of access to the educational opportunities or benefits provided by the school.

11. The University's tolerance of violations of school rules on drugs, underage abusive drinking, and opposite-sex late night dormitory guests—as well as its failure to enforce basic

[1] *See* 20 U.S.C. § 1681.

dormitory safety and oversight protocols—constitute reckless and deliberate indifference to the school's Title IX obligations, contributing to a hostile environment that denied Plaintiff equal access to educational opportunities on the basis of her sex, and which led to her rape by Defendant Roe. The University's reckless and deliberate behavior made Plaintiff's rape more likely to occur because of the dangerous environment it created for female freshmen. And, by arbitrarily and capriciously reversing the Title IX hearing panel's decision for spurious and self-interested reasons, the University then deliberately and unnecessarily caused Plaintiff additional distress, further denying her access to educational opportunities.

## JURISDICTION

12. The Court has subject matter jurisdiction over the Title IX claims pursuant to 28 U.S.C. § 1331, as they arise under 20 U.S.C. § 1681, *Discrimination based on sex*, and common law claims. The Court also maintains pendent jurisdiction over related state law tort claims of gross negligence, negligence *per se*, assault, battery and intentional infliction of emotional distress as they are claims that involve a common set of operative facts and logically related claims.

13. The University annually receives in excess of $4,680,000 in federal funds for educational activities.

## VENUE

14. Venue is proper under 28 U.S.C. § 1391(b), as the University is a corporation residing in and subject to personal jurisdiction in this District, and acts complained of occurred in this District.

## THE PARTIES

15. Plaintiff, a citizen and domiciliary of Maryland, was a University freshman in 2024.

16. Defendant Roe, a citizen and domiciliary of Maryland, was a University student-athlete in 2024.

17. Catholic University is a 501(c)(3) private university located in the District of Columbia, with its headquarters and principal place of business also in the District of Columbia.

## FACTUAL ALLEGATIONS

### A. The Assault on Plaintiff

#### *i. Plaintiff's dormitory*

18. On October 18, 2024, while in University housing, the eighteen-year-old Plaintiff ingested and smoked marijuana and consumed several vodka drinks. Witnesses testified that Plaintiff appeared "obviously impaired" and "falling over" drunk after consuming "too many [drinks] to count" before heading to a social event at another University-owned property. En route, Plaintiff stated on social media that she was "so [expletive]ing high!" Plaintiff testified that she was "incredibly intoxicated" at the time.

19. Defendant Roe introduced himself to Plaintiff on October 13, 2024 via social media, and invited her to a party at a University-owned "rugby house." Photographs and a video of Plaintiff preparing to go out October 18, 2024 show her to be uninjured at that time, Ex. 1,[2] and witness testimony confirmed that she appeared uninjured.

#### *ii. The rugby house party*

20. Defendant Roe and Plaintiff met for the first time in person at approximately 11:00 PM on October 18, 2024. Defendant Roe claimed to Plaintiff that he had already consumed ten

---

[2] Plaintiff will file and serve her exhibits subsequent to the Court's resolution of a forthcoming motion to seal, as they include photographs of her face and breasts.

shots of vodka, but did not appear to Plaintiff to be inebriated. Defendant Roe carried an open beer, but Plaintiff did not observe him drink it. Defendant Roe served Plaintiff several alcoholic seltzers over the following hour, during which he mechanistically asked her five times to return to his dormitory to drink vodka with his roommate.

***iii. Defendant Roe's dormitory***

21. Plaintiff eventually left the party, escorted by Defendant Roe, and at 12:05 AM, they arrived at his dormitory. The hall monitor, a University employee, stated that Defendant Roe need not sign Plaintiff in if she planned to leave by 2:00 AM. That monitor observed Plaintiff headed in the direction of Defendant Roe's room, after midnight, after she drank several alcoholic seltzers on top of the marijuana and several drinks consumed earlier that rendered her "obviously impaired."

22. Defendant Roe served Plaintiff several additional alcoholic drinks in a friend's room across the hall from Defendant Roe's room. He then led Plaintiff into his room. Contrary to Defendant Roe's statements and Plaintiff's expectations, there was no roommate in his dormitory room. Plaintiff informed Defendant Roe that she felt sick. Plaintiff testified that she "was intoxicated to the point where everything going on did not make sense."

***iv. The sexual assault***

23. Defendant Roe proceeded to kiss Plaintiff, including on her neck.

24. Plaintiff is five feet six inches tall and one hundred and ten pounds. Defendant Roe is a college football player, five feet eleven inches tall and 170 pounds.

25. Suddenly, without Plaintiff's consent, Defendant Roe bit her breasts, strangled her with his right hand and pinned her down with his left hand, without her consent. Plaintiff was unable to breathe, move, speak, or swallow; she saw stars, and feared death. Medical evidence

subsequently showed bites on Plaintiff's breasts, bruising of Plaintiff's right forearm and neck, and linear scratches on her neck consistent with attempts to pry Defendant's hand from her throat.

26. Defendant Roe proceeded to remove Plaintiff's jeans and underpants and rape and sodomize her, without her consent. Defendant Roe wore a condom during part of the assault. Plaintiff told Defendant Roe that she was in pain, cried and asked him to stop. Defendant Roe replied, "It won't hurt at all."

***v. The aftermath of the sexual assault***

27. Defendant Roe asked Plaintiff to sleep in his room. Instead, Plaintiff gathered her belongings, dressed, and left his room—accidentally leaving her underwear behind as she rushed to leave. Once out of Defendant Roe's room, Plaintiff immediately called a friend and asked her to meet at Plaintiff's dormitory room right away. Plaintiff did not run, due to pain and shock. Despite her intoxication and distress, University personnel working the front desks at neither party's dormitory inquired of her well-being, or offered her any assistance whatsoever.

28. Upon reaching her dormitory room, Plaintiff told at least six outcry witnesses that she had been raped: her friends Oceane Regis and Rosary Tambunan, her sister and mother, her resident advisor and community director, who in turn informed University security.

29. Distraught, Plaintiff briefly showered, as she felt dirty and violated.

30. Defendant Roe soon direct-messaged Plaintiff via social media, asking "Are you good?" Plaintiff immediately blocked Defendant Roe on social media.

31. On October 20, 2024 Plaintiff underwent a Sexual Assault Nurse Examiner (SANE) exam. Due to pain after non-consensual penetration, Plaintiff did not permit staff to put a speculum or anoscope inside her, or swab her anus. Plaintiff—a traumatized girl, not a detective— did not understand the evidentiary value of such examinations in a rape investigation.

32. The exam also found thin, opaque liquid pooled in the entrance to Plaintiff's vagina. Medical personnel did not test the liquid, which a nurse who treated Plaintiff explained could have been either semen or vaginal discharge, for example, to determine its DNA

33. Plaintiff suffers from post-traumatic stress; symptoms include acid reflux, angry outbursts, cessation of menstruation, crying, emotional instability, flashbacks, loss of interest in activities, nausea, and resistance to physical contact. She must take five medications daily. Plaintiff sees two psychologists (a trauma-focused individual therapist and a general/family therapist) and a psychiatrist, and participates in a survivor's group.

**B. The University's Response**

34. Plaintiff lived in realistic fear that she might encounter her assailant, Defendant Roe. Indeed the Defendant Roe's roommate cursed her when he saw her on campus.

***i. The hearing***

35. The University convened a Title IX board to consider Plaintiff's rape complaint against Defendant Roe. Plaintiff's testimony to that board is summarized *supra*.

36. According to Defendant Roe's testimony, Plaintiff was not inebriated, and she asked him to go to his room to obtain alcohol. Upon arriving at his dormitory, Plaintiff allegedly removed both parties' clothes, and initiated a sexual encounter, which included his giving her "hickies" and consensually penetrating her vagina with his finger, and her affirmatively performing oral sex on him, while moaning and stating, "I want you to have sex with me."

37. Defendant Roe claimed that he then searched his and his roommate's belongings for a condom. However, Defendant Roe claimed that he discovered, only when his trousers were removed (he gave contradictory testimony about who removed them), that he was flaccid.

Defendant Roe's testimony that he did not have vaginal or anal sex with Plaintiff was contradicted by that of his own expert witness, who saw evidence of such intercourse in the SANE report.

38. Defendant Roe then allegedly helped Plaintiff dress, during which time he purportedly hugged her, and reportedly noticed no bruising. Defendant Roe claimed that Plaintiff also expressed her desire to see Defendant Roe again.

39. Defendant Roe presented no character witnesses in his defense, stating that he kept Plaintiff's allegations to himself, confiding only in his father, who did not appear as a witness.

40. On February 27, 2025, following a February 24, 2025 hearing, the University's Title IX board found that Defendant Roe raped Plaintiff. The board gave these good reasons for its findings: (a) photos of Plaintiff's bruises (Ex. 2); (b) her medical records of abdominal, anal, and vaginal pain; (c) her immediate blocking of Defendant Roe on social media; (d) outcry witnesses' testimonies that she stated she had been raped; and (e) witnesses' observations of dramatic changes in her personality after October 18, 2024.

41. In contrast, the board noted (a) Defendant Roe's flat affect while discussing sensitive issues; their incredulity about his claims that he (b) was unaware until he was naked of his flaccidity, and that he (c) observed no bruises on Plaintiff's neck while purportedly dressing and hugging her; and (d) his failure to present any character witnesses.

***ii. The appeal***

42. Pursuant to hearings on March 13 and 19, 2025, on March 24, 2025 Lawrence Morris, counsel to the University's president, unilaterally overturned the Title IX board's decision on grounds of what he found to be procedural irregularity, and new and outcome determinative evidence not reasonably available to Defendant Roe at the time of the hearing. In reality, Mr.

Morris's actions were arbitrary and capricious, contrary to University policy, and motivated by a desire to protect the University.

43. Of note, Mr. Morris and Defendant Roe's appellate counsel overlapped as a teacher and student at the U.S. Army's Judge Advocate General's Legal Center and School in Charlottesville, Virginia. Mr. Morris failed to either disclose this ethical conflict to Plaintiff's counsel, or to recuse himself from adjudicating the matter.

44. Mr. Morris relied upon hearsay and double-hearsay statements that Plaintiff allegedly had anal sex with an abusive ex-boyfriend on October 15, 2024, as explaining injuries photographed on October 19, 2024 and documented by medical personnel on October 20, 2024. Plaintiff denies sex of any kind since October 12, 2024, seven days before Defendant Roe raped her. Mr. Morris did not explain how anal sex could lead to Plaintiff's bruised arm and neck and injured breast. Nor did Morris explain how any injuries to Plaintiff inflicted around October 15, 2024 would not be present to witnesses or in images taken on October 18, 2024 yet present on October 19-20, 2024.

45. Mr. Morris further relied upon testimony that Plaintiff was told verbally before the Title IX board that DNA tests taken during her SANE exam only revealed unidentified male DNA on her neck, and not inside her vagina or anus, and that she stated that this information should not be shared with the board. Mr. Morris concluded that this impeached her testimony to the board, that she was unaware of the results of any DNA tests.

46. Plaintiff's testimony that she was unaware of the DNA test results only because she had not yet received them in writing was, indeed, misleading. Plaintiff had a good-faith, mistaken belief from her discussion with a SANE nurse that formal test results would come in writing fifty days after the exam. However, Plaintiff did not consent to exams with a speculum or anoscope, or

the swabbing of her anus, and she testified that Defendant Roe wore a condom during vaginal and anal sex. Therefore, the failure to find anyone else's DNA in her vagina or anus is not dispositive of whether someone penetrated her without consent. And no one tested the DNA found on Plaintiff's neck against a sample of Defendant Roe's DNA.

47. Mr. Morris also relied upon hearsay and multiple-hearsay testimony—some obtained after the original Title IX hearing—that Plaintiff stated she had anal sex with her ex-boyfriend on or about October 15, 2024, as impeaching her testimony that she was not in a relationship with anyone on October 19, 2024. Plaintiff denies having any sex with anyone for seven days before Defendant Roe raped her. Still, Mr. Morris did not scrutinize the nature of the alleged anal-sexual encounter to determine with specificity whether it could have left the bruising on Plaintiff's arm, neck and chest.

48. Mr. Morris's determinations about Plaintiff's credibility were also based on an outdated understanding of what it means for young people to be "in a relationship." More importantly, Mr. Morris did not identify a principled basis for overturning the factual judgment of the Title IX board and substituting his own. On information and belief, Mr. Morris's decision was based on evidence obtained *after* the initial hearing occurred. This was an inappropriate, arbitrary, and capricious measure in Mr. Morris's role as an appellate authority—particularly because University policy did not authorize him to overturn the original Title IX panel's decision without returning newly obtained evidence for consideration.

49. With respect to evidence of Plaintiff's prior sexual conduct—evidence strictly protected in every other context under Rape Shield laws—Mr. Morris failed to explain how sex around October 12-15, 2024, could have produced injuries on and around Plaintiff's arm, neck, and chest that were not visible until October 19 or 20, 2024. Mr. Morris apparently made the exact

presumption that normal evidentiary rules prohibits: that a woman who previously consented to sex must also have consented to sex on the night in question.

50. Mr. Morris further relied upon witnesses' post-hearing statements that they did not now believe Plaintiff because of alleged inconsistencies about "little" and "small details" regarding October 18-19, 2024. These criticisms lack any specificity that might give them probative value, and to the extent they warranted reconsideration, a new hearing panel—and not Mr. Morris's unilateral decision-making—was the proper venue.

51. Finally, Mr. Morris found the board's consideration of the fact that Defendant Roe called no character witness to be procedurally irregular, as rules regarding Title IX proceedings permit, but do not require such testimony.

52. Mr. Morris was the trial advocacy chief for the U.S. Army after service as a prosecutor and defense lawyer, positions involving substantial responsibility for adjudicating sex crime complaints, as the Army suffers from a sexual assault epidemic which occupies substantial amounts of its judge advocates' time. Inexplicably, Mr. Morris did not address witnesses' testimony that Plaintiff was impaired, her contemporaneous statement en route to the party that she was so high, the corroborated testimony that she drank more at both the party and in Defendant Roe's room, and her testimony that she "was intoxicated to the point where everything going on did not make sense." Defendant Roe admitted that he digitally penetrated Plaintiff's vagina and (in his charitable version of events) received oral sex from her. As multiple corroborative pieces of evidence showed that Plaintiff was so inebriated as to lack the ability to consent to these acts—and based on Plaintiff's testimony that she did not consent and was physically overcome by Defendant Roe—Defendant's actions amounted to criminal sexual assault and sodomy, respectively.

53. There is a reason that counsel to the University's president ignored the elephant in the room. An eighteen year-old freshman in her first weeks of college, high and drunk in her dormitory, even before she headed to a party at a University-owned house where she consumed several more liquor drinks, was at a minimum sexually assaulted and sodomized (in fact, she was also raped) by a classmate on school property, after interacting with a University employee as she headed to Defendant Roe's room. Mr. Morris ignored these facts because the University repeatedly fails to provide young women such as Plaintiff an environment free from sexual violence, thereby denying them the benefits of an educational program receiving federal financial assistance.

54. There is a history of male Catholic University athletes sexually assaulting female freshmen while these young women are too intoxicated to consent to sex. In *Cavalier v. Catholic Univ.*, University officials unreasonably ignored evidence that the plaintiff had a blood alcohol level nearly three times the legal limit for driving at the time of her rape by a football player. *See* 1:16-cv-2009 (D.D.C.), Complaint Dkt. 1 at ¶¶ 100-02. And in *Latham v. Catholic Univ.*, a freshman female student was gang-raped by male lacrosse players in a dormitory after drinking as many as twenty drinks and vomiting at a campus party; the victim fell down dormitory stairs after her assault. *See* 1:08-cv-1852 (D.D.C.), Complaint, Dkt. 1 at ¶¶ 10-13.

55. These crimes are, and ought to be, especially embarrassing to a parochial school. The University claims to promote "respect for persons' bodily integrity, chastity, and the sacredness of human sexuality" as the "belief in the inherent dignity of each person is the foundation to all Catholic social teaching," while the Church teaches that sexual violence "fails to treat that person as someone worthy of love," and also that the spectrum of sexual violence includes

alcohol and drug-facilitated sexual assault.[3] The University's actual practices fall far short of Catholic ideals.

**C. Title IX and University policy**

56. University policies regarding alcohol and drug use on school property, and late-night guests in student housing, were not followed by the University and its staff, leaving Plaintiff at grave risk of sexual assault in violation of Title IX. The University's chief of staff then failed to hold Plaintiff's assailant, Defendant Roe, responsible for his actions, in a further violation of Title IX.

***i. Alcohol and drug abuse***

57. The University forbids underage drinking, alcohol abuse to include intoxication resulting in disorientation, and marijuana use—on school property, in buildings controlled by student organizations, such as the rugby house, and in off-campus activities harming student's health. University policy warns that risks associated with alcohol and drug abuse include impairment and unwanted sexual activity.[4] Yet Plaintiff was allowed to use marijuana and drink until incapacitation in her dormitory, the rugby house, and Defendant Roe's dormitory.

***ii. Overnight guests***

58. The University only allows guests to visit student rooms on Fridays and Saturdays until 2:00 AM, provided that the visits are consistent with the policy that hosts "are responsible for ensuring that their guest signs in and out with the hall monitor," and that an "overnight visit with a sexual partner is prohibited as this type of behavior is incompatible with the mission of the

---

[3] *See Sexual Assault and Violence Education*, Available at https://deanofstudents.catholic.edu/sexual-assault/what-is-sexual-violence/index.html.

[4] *See* Student Alcohol and Other Drug Abuse Policy, available at https://policies.catholic.edu/students/studentlife/studentconduct/alcoholdrugs.html.

University …”.[5] Yet the hall monitor at Defendant Roe’s dormitory allowed him to bring Plaintiff, incapacitated, to his room without signing her in. Furthermore, University personnel should reasonably have known that Defendant Roe planned sexual relations with Plaintiff in his room, despite her intoxication, when he brought her there at midnight.

59. University policy further calls upon members of its community “to look out for each other.” The school advises:

> If you see someone in a risky situation, there are many different ways to step in and make a difference. This is known as ‘bystander intervention’ … If you are comfortable you can directly approach either or both parties involved. Let them know your concerns and why you are intervening … Sometimes you may not feel that you are the best person to directly intervene in a situation. Maybe you do not know the person, do not feel safe, or just feel someone else would be more effective. That is OK … If you feel the situation is too serious for you to get involved or you are simply unsure, call the Department of Public Safety or find a Resident Assistant.

60. The hall monitor in Defendant Roe’s dormitory, by policy, ought to have intervened by asking Plaintiff if she was inebriated, not allowing her to accompany Defendant Roe to his room, and helping her get safely home. If the hall monitor believed someone else’s intervention would have been more effective, or was unsure, he ought to have called the Department of Public Safety or found a resident assistant and asked them to intervene. Yet the hall monitor did none of these things. Neither did Defendant Roe’s resident assistant intervene. Instead, Defendant Roe led Plaintiff to his room, plied her with more alcohol, and brutally raped her.

***iii. Sexual assault***

61. The University’s code of conduct prohibits, as it must, any violation of its Title IX policy: “The University prohibits sex discrimination in its programs and activities and is committed to creating a living, learning, and work environment free from sex discrimination and harassment.” Examples of discrimination covered by Title IX are sexual assault, including rape

[5] *See Housing Services*, available at https://housing.catholic.edu/policies/index.html.

sodomy, and/or fondling without the victim's consent, including due to temporary incapacity.[6] Both Defendant Roe and Plaintiff testified to an act of oral sex, while Plaintiff further credibly alleged anal sex and vaginal rape.

62. Consent, the University explains, means:

> [I]nformed, freely given, mutually understandable words or actions that indicate a willingness to participate in sexual activity. Effective consent may never be obtained when there is a threat of force or violence … consent to one form of sexual activity does not imply consent to other forms of sexual activity.
>
> Consent can be revoked at any time. Consent cannot be obtained from … someone who is unable to understand … This includes someone who is incapacitated due to drugs [or] alcohol … lack of active resistance does not imply consent. Voluntary intoxication is not an excuse for failure to obtain consent.[7]

63. Plaintiff did not freely give Defendant Roe indicia of a willingness to participate in oral, vaginal, or anal sex. Defendant Roe forced Plaintiff to submit to these acts through threat of force or violence. Plaintiff's consent could in any case not be obtained from a woman unable to understand her situation because she was voluntarily incapacitated due to drugs and alcohol. Assuming *arguendo* that Plaintiff had been capable of consenting to Defendant Roe fondling her breasts, that would not have implied her consent to subsequent digital penetration and oral, vaginal, and anal sex. In fact, Plaintiff attempted to resist but Defendant Roe overcame her resistance by force. Plaintiff actively resisted Defendant Roe, leaving claw marks on her neck in an attempt to pry his hands from her throat—an obvious sign of a lack of consent. Plaintiff further stated to Defendant Roe that she was in pain and asked him to stop when he digitally penetrated her anus, and then she began to cry—another obvious sign of a lack of consent. There was no reasonable mistake of fact on behalf of Defendant Roe regarding Plaintiff's lack of consent.

---

[6] *See generally* 20 U.S.C. § 1092, Institutional and financial assistance information for students, and § 1689, Task Force on Sexual Violence in Education.

[7] *See* Title IX Policy, available at https://policies.catholic.edu/students/title-ix-policy.html.

64. Incapacitation, the University explains, means the temporary inability to consent because an individual is mentally and/or physically helpless. The University adds that the impact of alcohol and drugs will vary from person to person, and concludes that the "perspective of a sober, reasonable person in the position of the respondent will be the basis for determining whether a respondent should have been aware that the complainant was incapacitated and therefore unable to consent." *See id*.

65. Plaintiff was too incapacitated to consent to sex. Plaintiff stands five feet, six inches tall and weighs one hundred and ten pounds. Within the space of a few hours, Plaintiff used marijuana and drank several vodka drinks before a party, where she consumed several alcoholic seltzers, and two or three more vodka shots before her and Defendant Roe's sexual encounter. Witnesses described Plaintiff as "obviously impaired" and "falling over" and she described herself while headed to the party as "so high." Defendant Roe was aware that Plaintiff was incapacitated and thus unable to consent to sex. Yet under the terms of University policies and Title IX, Defendant Roe sexually assaulted Plaintiff.

## <u>LEGAL CLAIMS</u>

66. Title IX provides that no United States person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program receiving Federal financial assistance."[8]

67. As Title IX bears no statute of limitations, federal courts apply analogous state statutes of limitation. As the events here at issue occurred less than two years prior to filing of these claims, they are timely under both District of Columbia law and Title IX. Amendments made to Title IX in 2020 strengthened provisions related to universities' duties to root out sexual assault.

[8] 20 U.S.C. § 1681.

**COUNT I: PRE-ASSAULT DELIBERATE INDIFFERENCE**
**(Against Defendant Catholic University)**

68. By reference, the paragraphs above are fully set forth as if separately stated.

69. The University and, on information and belief, its administrators, including but not limited to Lawrence Morris and Associate Dean of Students Heidi Zeich, had actual knowledge prior to Plaintiff's rape that its policies and procedures, as implemented, made female students vulnerable to on-campus rapes. The University failed to enforce its policies, harming Plaintiff, despite the University's knowledge that it suffers from a pattern and practice of older male athletes raping female freshmen students too intoxicated to consent to sex after alcohol-fueled parties on University property. The University's tolerance of violations of school rules on marijuana use, underage and abusive drinking, and opposite-sex late night guests in dormitories, constitute deliberate indifference to the University's Title IX obligations. The University's deliberate indifference contributed to a hostile educational environment denying Plaintiff access to educational opportunities, leading directly to her rape by Defendant Roe.

**COUNT II: POST-ASSAULT DELIBERATE INDIFFERENCE**
**(Against Defendant Catholic University)**

70. By reference, the paragraphs above are fully set forth as if separately stated.

71. By reversing the Title IX hearing panel's decision for weak and self-interested reasons, and in violation of University policy, the University unnecessarily caused Plaintiff additional emotional distress, denied her access to educational opportunities, and created the appearance of gender discrimination in its handling of Title IX grievances. Counsel to the University's president rejected Plaintiff's allegations of sexual assault, despite the Title IX hearing board finding in her favor. To reverse this decision, Mr. Morris relied upon: (a) hearsay and double-hearsay that Plaintiff was (falsely) alleged to have had anal sex with an abusive ex-

boyfriend four days before the assault, as explaining injuries recorded on October 19-20, 2024, injuries inexplicably not appearing to witnesses or in images on October 18, 2024; (b) Plaintiff's misstatement about the failure to find Defendant Roe's DNA on or inside of her, even though she did not receive relevant exams and tests, and her assailant wore a condom; (c) witnesses' statements, after the hearing, alleging that Plaintiff was inconsistent about small details regarding her assault; and (d) that the board improperly considered Defendant Roe's failure to provide character witnesses. On these flimsy bases, the University, through Mr. Morris, reversed the board's decision despite overwhelming evidence, including Defendant Roe's own testimony, showing that he had at the very least sodomized Plaintiff when she was inebriated to the point of an inability to consent. These actions demonstrate the University's deliberate indifference to its procedural obligations under Title IX.

72. Furthermore, when the University learned that Plaintiff suffered a rape, the University had a duty to implement safety measures on Plaintiff's behalf, given the violent nature of Defendant Roe's misconduct, and to offer her related accommodations. The University did not do so.

**COUNT III: GROSS NEGLIGENCE**
**(Against Defendant Catholic University)**

73. By reference, the paragraphs above are fully set forth as if separately stated.

74. The University recklessly made Plaintiff's rape more likely to occur because of the dangerous environment it created for female freshmen. The University is directly liable in negligence for its role in causing this harm, and that negligence was sufficiently gross so as to warrant the imposition of punitive damages. The University possessed an affirmative duty to take reasonable measures to protect Plaintiff, and other female freshmen, such as her predecessors Ms. Cavalier and Ms. Latham, from being raped by athletes while these young women intoxicated,

resulting in a hostile educational environment at the school. These responsibilities included duties to properly warn, train, and educate University students and staff how to avoid sexual assault, and if necessary, to fairly resolve sexual assault complaints. *Res ipsa loquitur*: the University failed to do so. Plaintiff's parents entrusted their teenaged daughter to the care of the University, establishing a special relationship and a duty of *in loco parentis* care between the school and Plaintiff. This is a responsibility the University voluntarily accepted in return for her parents' payment for tuition, room and board of approximately $50,000 per academic year in return for a specifically Catholic education for their young daughter in a safe, parochial school environment. (Plaintiff's tuition and fees were less than the normal cost of $84,124 due to merit scholarships she received.)

**COUNT III: NEGLIGENCE *PER SE***
**(Against Defendant Catholic University)**

75. By reference, the paragraphs above are fully set forth as if separately stated.

76. Under District of Columbia law, the delivery of alcoholic beverages to a person under twenty-one years of age, an intoxicated person or any person who appears to be intoxicated is prohibited.[9] Plaintiff and Defendant Roe were both served alcohol in the "rugby house" owned by the Defendant university, despite both students being underage, and Plaintiff being visibly intoxicated. Plaintiff was also served alcohol in dormitories owned by the Defendant university, again despite her being underage and visibly intoxicated. The delivery of alcohol to Plaintiff and Defendant Roe in properties owned and controlled by Defendant university is negligence *per se*. Defendant university is liable for injuries Defendant Roe inflicted on Plaintiff, as the illegal service of alcohol to underaged students, one of whom was visibly intoxicated, directly caused Plaintiff's injuries.

---

[9] *See* D.C. Code § 25-78(A)(1)-(2).

**COUNT V: ASSAULT**
**(Against Defendant Roe)**

77. By reference, the paragraphs above are fully set forth as if separately stated.

78. Defendant Roe assaulted Plaintiff against her will, with the intent to cause harmful contact with her. Defendant Roe's actions toward Plaintiff created in her a reasonable fear of imminent battery and death. Defendant Roe did batter Plaintiff, which she fearfully perceived in the moments preceding the contact, when she was physically unable to escape him. As a direct result of Defendant Roe's assaultive conduct, Plaintiff experienced emotional trauma—a reasonably foreseeable result of his actions. Defendant Roe's assault proximately caused Plaintiff psychological harm. Defendant Roe is therefore liable for assault. Because Defendant Roe's actions reflect willful disregard for the rights of Plaintiff, she is entitled to punitive damages.

**COUNT VI – BATTERY**
**(Against Defendant Roe)**

79. By reference, the paragraphs above are fully set forth as if separately stated.

80. Defendant Roe digitally penetrated Plaintiff's vagina and anus, orally sodomized her, strangled her, held her down, vaginally raped her, and anally sodomized her without consent, in excess of permissible contact, and without excuse or justification. Defendant Roe intended his actions toward Plaintiff. Defendant Roe's acts caused Plaintiff physical injury, emotional pain, and medical expenses. Defendant Roe is therefore liable for battery. Because Defendant Roe's actions reflect willful disregard for Plaintiff's rights, she is entitled to punitive damages.

**COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendant Roe)**

81. By reference, the paragraphs above are fully set forth as if separately stated.

82. Defendant Roe's attacks on Plaintiff were intentional and he knew that his conduct would threaten Plaintiff. Defendant Roe's attacks on Plaintiff were outrageous and did not have

her consent. Defendant Roe's conduct caused Plaintiff physical harm and emotional distress for which she obtained treatment. Defendant Roe carried out his actions through assault and battery. Defendant Roe is therefore liable for intentional infliction of emotional distress. Because Defendant Roe's actions reflect willful disregard for Plaintiff's rights, she is entitled to punitive damages.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter an award and judgment in her favor against Defendants, jointly and severally, as follows:

a. Statutory damages;

b. Compensatory damages in an amount to be determined at trial;

c. Punitive damages against Defendant Roe for his intentional acts and his malicious, wanton and willful disregard for Plaintiff's rights;

d. Expenses and costs, including attorneys' fees pursuant to Title IX's fee-shifting provisions;

e. Pre-and-post judgement interest; and

f. Such other relief as the Court deems appropriate.

Dated: October 17, 2025

Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, D.C. Bar No. 1021479
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234 | F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law
*Attorney for Plaintiff*