**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JANE DOE,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Action No. 1:25-cv-02978-RJL** |
| **JOHN ROE, *et al.*,** | * | |
| **Defendants.** | * | |

* * * * * * * * * * *

**DEFENDANT THE CATHOLIC UNIVERSITY OF AMERICA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COUNTS I-IV OF THE COMPLAINT**

Pursuant to Fed. R. Civ. P. 12(b)(6) and LCvR 7, Defendant, The Catholic University of America ("CUA" or "University"), by and through its attorneys, Michael J. Marinello, Veronica J. Mina, and Kagan Stern Marinello & Beard, LLC, respectfully submits this Memorandum of Points and Authorities in Support of its Motion to Dismiss Counts I-IV of the Complaint filed by Plaintiff Jane Doe ("Plaintiff" or "Jane Doe").

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF ALLEGED FACTS ........................................................................3

STANDARD OF REVIEW ........................................................................................6

ARGUMENT ..............................................................................................................7

A. Plaintiff fails to state a claim for deliberate indifference under Title IX ................7

1. *Deliberate indifference claims under Title IX present a high bar for plaintiffs which courts rigorously police on motions to dismiss* .................7

2. *Count I fails to state a claim for pre-assault deliberate indifference* ........10

3. *Count II fails to state a claim for post-assault deliberate indifference* ........................................................................21

B. Plaintiff fails to state a claim for gross negligence or negligence *per se* ..............30

1. *Count III fails to state a claim for gross negligence* ................................30

2. *Count IV fails to state a claim for negligence per se* ................................33

CONCLUSION ..........................................................................................................34

## I. INTRODUCTION

This case arises from the allegation of sexual assault by Plaintiff against Roe and the related investigation and hearing process conducted under CUA's Title IX Policy and Grievance Procedures. CUA takes reports of sexual misconduct seriously and responds to them promptly and appropriately. Consistent with this approach, when Plaintiff reported the sexual assault against Roe, CUA conducted a swift and extensive investigation, issued its final report after obtaining input from both Plaintiff and Roe, and promptly convened a Title IX Hearing Board, which found Roe responsible for the sexual assault as alleged and imposed the sanction of expulsion. The entire process took only four months (including CUA's break between the fall and spring semesters) and cannot possibly be alleged to have been clearly unreasonable.

Roe, however, appealed the Hearing Board's decision on multiple grounds, as permitted by the Title IX Grievance Procedures. Like the hearing process, the appeal was adjudicated by the CUA Chief of Staff promptly and in full accord with the Title IX Grievance Procedures. In a reasoned, written decision, the Chief of Staff found merit to certain appellate grounds asserted by Roe (while rejecting others), overturned the Hearing Board's decision, and returned the case to be re-heard before a new Hearing Board. Despite the case being returned for a re-hearing, Plaintiff withdrew from CUA and declined to participate in any further Title IX proceedings, thereby requiring CUA to dismiss and close the matter. The entire appeal took just under one month and cannot possibly be alleged to have been clearly unreasonable.

Plaintiff now alleges claims under Title IX for pre-assault and post-assault deliberate indifference against CUA, as well as gross negligence and negligence per se. In the Title IX context, the law vests decision-making authority in university administrators to respond to reports of student sexual harassment and assault. Under this standard, a university may be held liable for

its response to a report of sexual misconduct *only if* it acts with *deliberate indifference* to *known* acts of harassment in its programs or activities. Deliberate indifference is a high bar; far more than a mere reasonableness standard, it is a heightened standard that requires a plaintiff to show that the defendant's conduct was *clearly unreasonable*. Given this high standard, courts – including this Court – have recognized that it is critical to scrutinize such cases at the outset and dismiss the ones that fail to satisfy Fed. R. Civ. P. 12(b)(6). This is such a case, as Plaintiff's Complaint does not, and cannot, allege sufficient facts or plausibly assert that CUA had actual knowledge of any heightened risk of sexual assault, that CUA's conduct was clearly unreasonable, or that Plaintiff was denied the benefit of any educational opportunities.

Meanwhile, in furtherance of her claims for negligence, Plaintiff attempts to impose a duty of care on CUA where none exists. In her claim for gross negligence, Plaintiff asserts that CUA has a duty to her under the doctrine of *in loco parentis*, a concept that has been consistently rejected across the country, decayed to a point of irrelevance. Similarly, Plaintiff's claim for negligence *per se* based on the D.C. Alcoholic Beverage Control Act also fails where liability under that statute extends only to tavern owners that sell alcohol to minor or intoxicated persons, which, of course, CUA is not.

## II. STATEMENT OF ALLEGED FACTS[1]

On the night of Friday, October 18, 2024, Plaintiff and Defendant John Roe ("Roe"), both freshmen at the University, met at an off-campus party at the "rugby house," [2] at approximately 11:00 P.M. *See* ECF No. 11 ("Compl."), at ¶¶ 1, 2, and 18-20. Shortly thereafter, Plaintiff accompanied Roe back to his dormitory hall where, after briefly going to another room, they entered Roe's room at approximately 12:05 A.M. (now Saturday, October 19th).[3] *Id.* at 21; *see also* Exhibit A – Title IX Hearing Board's Determination Memorandum, dated February 27, 2025, at

---

1 Although CUA strongly disagrees with the majority of factual allegations asserted in the Complaint, consistent with Fed. R. Civ. Pro. 12(b)(6) and the longstanding standards for motions to dismiss, those allegations are nevertheless assumed to be true for purposes of this motion (unless specifically indicated and explained otherwise herein). In addition, however, certain additional indisputable facts are also drawn from several documents which are referenced and/or are necessarily integral to the allegations in the Complaint, making them properly before the Court at this stage. *See Richter v. Catholic Univ. of Am.*, 2019 U.S. Dist. LEXIS 20150, *1 n.1 (Feb. 7, 2019) (finding that exhibits appended to CUA's motion to dismiss were properly before the Court where the authenticity is not disputed and they are referred to in the Complaint and are integral to the claim) (citations omitted); *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 189 (D.D.C. 2016) ("[A]t the motion to dismiss stage, [the court] may consider documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.") (quotations and citations omitted). These include the Title IX Hearing Board's Determination Memorandum (attached hereto as Exhibit A), the Title IX Decision on Appeal (Exhibit B), the CUA Housing Services Policy (Exhibit C), the CUA Title IX Grievance Procedures (Exhibit D), the email officially withdrawing Plaintiff from her enrollment at CUA (Exhibit E), and the notification letters to Plaintiff and Roe closing the Title IX case (Exhibit F).

2 Plaintiff alleges in her Complaint that the "rugby house" is owned by CUA, which is false. This fact is not material, however, for purposes of this Motion to Dismiss.

3 Under CUA policy, on Friday and Saturday nights, students who reside in one dormitory are allowed to be guests of students in other dormitories until 2:00 A.M. *See* Exhibit C – CUA Housing Services Policy, at "Visitation in the Residence Halls," Definitions ¶ C (Visitation Hours) (the Housing Policy is referenced in the Complaint at ¶ 61 and n.5 and also publicly available at http://housing.catholic.edu/policies/index.html, as cited by Plaintiff). The Housing Policy further provides that "[h]osts are responsible for ensuring that their guest signs in and out with the hall monitor," and "the host resident must accompany their guests at all times." *Id.*, at Policy ¶ 2.

3.[4] Plaintiff alleges that she consumed alcohol and marijuana – in violation of University policy – in her dormitory room before going to the off-campus party, at the off-campus party, and in Roe's dormitory room. Compl., at ¶¶ 18, 20, and 22. Plaintiff alleges that Roe served her alcohol at both the "rugby house" and at Roe's dormitory. *Id.* at ¶¶ 20-22. However, "while both [Doe] and [Roe] had consumed alcohol that night, the parties' own statements, witness statements, and security video footage led the board to conclude that neither [Doe] nor [Roe] were incapacitated due to alcohol consumption when they entered [Roe's] room." Exh. A, at 4.

Plaintiff exited Roe's room alone at 12:48 A.M. and returned to her dormitory hall by 12:50 A.M. Exh. A, at 4. Upon returning there, Plaintiff reported she had been sexually assault by Roe to two of her friends, her sister, her mother, and her resident advisor and community director, who in turn immediately informed CUA security. Compl., at ¶ 28. The next day, October 20, 2024, Jane Doe underwent a Sexual Assault Nurse Examiner (SANE) exam, although she did not permit staff to put a speculum or anoscope inside her, or swab her anus. *Id.* at 31.

Under CUA's Title IX Grievance Procedures, following a prompt and extensive investigation,[5] CUA convened a Title IX hearing board ("Hearing Board") on February 24, 2025

[4] The Hearing Board's findings and decision (which Plaintiff acknowledges were found "quite reasonably") are referenced repeatedly in the Complaint (along with details of the hearing itself), and the Decision Memorandum is necessarily integral to the allegations and claims in the Complaint, making it a document that can properly be considered by the Court in adjudicating this Motion. *See* Compl., at ¶¶ 5, 35-41, and 71; *see also Richter*, 2019 U.S. Dist. LEXIS 20150, *1 n.1 and *Intelect Corp.*, 160 F. Supp. 3d at 189.

[5] As further discussed in Section IV below, at no point in the Complaint does Plaintiff allege any inadequacy or impropriety in CUA's investigation into her allegations against Roe. More specifically, according to the Determination Memorandum, Plaintiff filed her formal complaint against Roe on October 25, 2024. Exh. A, at 2. "That same day, the University notified both [Doe] and [Roe] of that formal complaint in a notice letter, describing the allegations, the grievance process and available support services." *Id.* The Memorandum further describes that "[u]pon receipt of the complaint, the University conducted a prompt, unbiased, and equitable investigation," which "included interviews of: [Doe], [Roe], Sergeant Durand Dohawk, Oceane

to conduct a hearing and receive evidence to consider Plaintiff's complaint of sexual assault against Roe. *Id.* at 35, 40; *see also* Exhibit D – CUA's Title IX Grievance Procedures.[6] Three days later, on February 27, 2025, the Hearing Board found that Roe "was responsible for the conduct alleged by [Doe]" and, "[i]n turn, the University determined that the appropriate sanction for [Roe] was expulsion." Exh. A, at 2; *see also* Compl., at 40. Roe appealed that decision which, in accordance with CUA's Title IX Grievance Procedures, was heard by CUA's Chief of Staff, Lawrence Morris, on March 13 and 19, 2025. *Id.* at 42. On March 24, 2025, Mr. Morris issued his decision, in which he overturned the Hearing Board's decision on grounds of one procedural irregularity, as well as new and outcome determinative evidence which was not reasonably available to Roe at the time of the hearing (while also rejecting other contentions presented in Roe's appeal). *Id.*; *see also* Exhibit B – Title IX Decision on Appeal, dated March 24, 2025.[7] Critically, and directly contrary

---

Regis, Rosary Tambunan, Omid Aliaskari, Sydney Hanley, and Christine Solomonides" and "also included a review of security camera footage, screenshot messages, photos, and medical records" in addition to "a review of applicable University policies and procedures" and expert reports and witness statements submitted by both [Doe] and [Roe]. *Id.* By mid-December 2024, "[t]he parties received a draft investigative report, as well as evidence relating to the draft investigative report," to which "[b]oth parties submitted responses…in early January 2025." *Id.* The Memorandum then describes that "[i]n late January, the University notified the parties that the matter would be resolved through a Title IX hearing and provided details relevant to that hearing," CUA then "sent the parties its Final Investigative Report on February 10, 2025," and "[o]n February, 24, 2025 the University held a hearing consistent with its Title IX Grievance Procedures." *Id.* The Complaint takes no issue with any aspect of this investigation or the adjudication at the Hearing Board level.

[6] The Title IX Grievance Procedures are referenced in the Complaint at ¶ 7 and are also publicly available at https://policies.catholic.edu/students/title-ix-grievance-procedures.html.

[7] Similar to the Hearing Board's Decision Memorandum, the Title IX Decision on Appeal is referenced throughout the Complaint and is integral to Plaintiff's allegations and claims, making it also properly before this Court in adjudicating this Motion. *See* Compl., at ¶¶ 6-8, 11, 42-51, and 71; *see also Richter*, 2019 U.S. Dist. LEXIS 20150, *1 n.1 and *Intelect Corp.*, 160 F. Supp. 3d at 189. Indeed, the Court's consideration of the Decision on Appeal is particularly crucial where Plaintiff falsely alleges in her Complaint that Mr. Morris improperly failed to refer the case for a re-hearing after overturning the Title IX Board's decision, *see* Compl., at ¶ 8, which the Decision on Appeal clearly indicates Mr. Morris did, in fact, expressly do. Exh. B, at 1 and 9.

to Plaintiff's false allegation that Mr. Morris "overturn[ed] the original Title IX panel's decision without returning newly obtained evidence for consideration," Mr. Morris's decision then expressly stated that he was "*returning the case to a new Hearing Board to consider evidence and responsibility*. The case is referred to the Dean of Students *for additional proceedings* consistent with this opinion." Exh. B, at 9 (emphasis added).

The next day, on March 25, 2025, Plaintiff permanently withdrew from CUA and declined to participate in any further Title IX proceedings. *See* Exhibit E –Withdrawal Acknowledgement Letter dated March 25, 2025. CUA then notified Plaintiff and Roe that Plaintiff's formal complaint was dismissed and the Title IX matter closed since Plaintiff was "no longer a participant in the education program of the University." Exhibit F – Notification Letters dated March 28, 2025.

While enrolled at CUA, Plaintiff (or her parents on her behalf) had entered into a contract with CUA whereby CUA would provide Plaintiff with a Catholic education in exchange for tuition, room, and board of approximately $50,000. Compl., at ¶ 74.

## III. STANDARD OF REVIEW

"Rule 12(b)(6) authorizes dismissal where a complaint 'fail[s] to state a claim upon which relief can be granted.'" *Steele v. United States*, 144 F.4th 316, 326 (D.C. Cir. 2025) (quoting Fed. R. Civ. P. 12(b)(6)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is not facially plausible unless the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal,* 556 U.S. at 678. A complaint that tenders "'naked assertion[s]' devoid of 'further factual enhancement'" fails to meet the plausibility standard or provide grounds for relief. *Id.* (alteration in original); *see also Twombly*, 550 U.S. at 557.

## IV. ARGUMENT

### A. Plaintiff fails to state a claim for deliberate indifference under Title IX.

Plaintiff alleges Title IX liability against the University on two grounds: Count One alleges pre-assault deliberate indifference based on CUA's purported failure to prevent the alleged assault against Plaintiff; and Count Two alleges post-assault deliberate indifference by CUA as a result of its Chief of Staff granting Roe's appeal and overturning the Hearing Board's decision. As set forth below, neither of those claims can survive a motion to dismiss.

#### 1. *Deliberate indifference claims under Title IX present a high bar for plaintiffs which courts rigorously police on motions to dismiss.*

"Title IX seeks to eliminate sex-based discrimination in education programs that receive federal funds." *Doe v. District of Columbia*, No. 23-7135, 2025 U.S. App. LEXIS 21086, at *17 (D.C. Cir. Aug. 19, 2025)[8] (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). It provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a). "Under this statute, the Supreme Court has authorized private lawsuits for money damages against schools, for failure to respond adequately to student-on-student harassment." *Raihan v. George Wash. Univ.*, 324 F. Supp. 3d 102, 108 (D.D.C. 2018) (citing *Davis*

[8] Until this recent decision in *Doe v. District of Columbia*, the D.C. Circuit does not appear to have addressed any cases involving student-on-student harassment under Title IX and appears to have issued very little guidance at all on deliberate indifference under Title IX generally.

*v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)). But "[b]ecause Title IX draws its authority from the Constitution's Spending Clause, schools must have 'adequate notice that they could be liable for the conduct at issue,' or else 'engage[ ] in intentional conduct that violates the clear terms of the statute.'" *Id.* (quoting *Davis*, 526 U.S. at 640, 642). "On this basis, [in] *Davis* [the Supreme Court] placed significant limits on Title IX liability for student-on-student harassment." *Id.*

"First, because 'a recipient of federal funds may be liable in damages under Title IX only for its own misconduct,' in 'circumstances wherein the recipient exercises substantial control over both the harasser and the context,' schools can only be liable for 'deliberate indifference to known acts of peer sexual harassment.'" *Id.* (quoting *Davis*, 526 U.S. at 640, 645, 648). And, "[i]f a funding recipient [itself] does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subjects' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. 644-45 (quoting Random House Dictionary of the English Language 1415 (1966) (defining "subject")). "Second,…the [*Davis*] Court also held that 'funding recipients are properly held liable…only where they are deliberately indifferent to sexual harassment…that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Raihan*, 324 F. Supp. at 108 (quoting *Davis*, 526 U.S. at 650).

Thus, "[t]o prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must satisfy five elements." *Doe*, U.S. App. LEXIS 21086, at *19. Specifically:

> First, the sexual harassment complained of must be "so severe, pervasive, and objectively offensive…that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651. Second, an official with authority to address the harassment must have "actual knowledge" of

> that harassment. *Id*. at 650; *see also Gebser*, 524 U.S. at 290. Third, the recipient must have "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. Fourth, the recipient's response or failure to respond must amount to "deliberate indifference to known acts of harassment." *Id*. at 643. Fifth, that "deliberate indifference" must "'subject[]' its students to harassment." *Id*. at 644. "That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id*. at 645

*Id*. at *19-20.

Several of these elements warrant closer examination. First and foremost, "[d]eliberate indifference is a 'high standard' that requires more than a showing of mere negligence." *Id*. at *19 (quoting *Davis*, 526 U.S. at 642-43). Rather, "[a] recipient is 'deliberately indifferent to…student-on-student harassment only where the recipient's response to the harassment or lack thereof is <u>*clearly unreasonable*</u> in light of the known circumstances.'" *Id*. (quoting *Davis*, 526 U.S. at 648) (emphasis added). Stated differently, "[i]n order to avoid liability, the 'recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable.'" *Id*. at *20 (quoting *Davis*, 526 U.S. at 649). "This standard is meant to provide administrators with 'flexibility' and 'to account both for the level of disciplinary authority available to the school and for the potential liability arising from certain forms of disciplinary action.'" *Id*. at *19-20 (quoting *Davis*, 526 U.S. at 648-49). "Thus, recipients need not 'purg[e] their schools of actionable peer harassment' nor 'engage in particular disciplinary action'" *id*. at *20 (quoting *Davis*, 526 U.S. at 648) (brackets in original), and "courts must 'refrain from second-guessing the disciplinary decisions made by school administrators.'" *Raihan*, 324 F. Supp. at 108 (quoting *Davis*, 526 U.S. at 646). "Victims, moreover, have no 'Title IX right to make particular remedial demands.'" *Doe*, U.S. App. LEXIS 21086, at *20 (quoting *Davis*, 526 U.S. at 648).

With respect to the requirement for knowledge or notice, it is indeed "actual knowledge" which is required, *see Davis*, 526 U.S. at 650 and *Gebser*, 524 U.S. at 290, and constructive

knowledge – i.e. allegations that the recipient reasonably should have known – is unquestionably insufficient. *See Blue v. District of Columbia*, 850 F. Supp. 2d 16, 33 (D.D.C. 2012) (where the "best Plaintiff can argue based on the facts that she pled is that school officials knew or should have known of the relationship, [this] level of knowledge [is] clearly insufficient to satisfy the demanding *Gebser* standard") (citing *Gebser*, 524 U.S. at 285 (imposing liability based on school district's constructive knowledge of discrimination would "frustrate the purposes" of Title IX)).

As for the denial of educational opportunities, "[p]eer harassment, the [*Davis*] Court explained, is not as likely as teacher-student harassment to have the 'systemic effect' on educational access necessary to create liability, especially if there is only one incident of harassment." *Raihan*, 324 F. Supp. at 108 (quoting *Davis*, 526 U.S. at 652-53).

Finally, "'there is no reason why courts' cannot, in 'appropriate case[s],' conclude 'as a matter of law' that the university's response was 'not clearly unreasonable.'" *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 26 (D.D.C. 2018) (quoting *Davis*, 526 U.S. at 649); *see also Raihan*, 324 F. Supp. at 108 ("*Davis* emphasized that [deliberate indifference] is no 'mere reasonableness standard' – making every case an exercise in fact-finding appropriate for juries – but a heightened standard that courts in appropriate cases should decide 'as a matter of law.'") (quoting *Davis*, 526 U.S. at 648-49). "That authority…extends to both motions to dismiss and motions for summary judgment." *Id.* (quoting *Davis*, 526 U.S. at 649). Indeed, "[c]ourts are to rigorously police this line, including on motions to dismiss, when a school's response does not violate the legal standard." *Raihan*, 324 F. Supp. at 108-09 (citing *Davis*, 526 U.S. at 649).

2. *Count I fails to state a claim for pre-assault deliberate indifference.*

Count I for pre-assault deliberate indifference alleges that CUA "had actual knowledge prior to Plaintiff's rape that its policies and procedures…made female students vulnerable to on-

campus rapes," that CUA "failed to enforce its policies…despite the University's knowledge that it suffers from a pattern and practice of older male athletes raping female freshman students too intoxicated to consent," and that CUA's "tolerance of violations of school rules on marijuana use, underage and abusive drinking, and opposite-sex late night guests in dormitories constitute deliberate indifference." Compl., ¶ 69. As alleged, Count I fails to state a claim upon which relief can be granted and should be dismissed with prejudice since Plaintiff cannot plausibly allege sufficient facts to state such a claim.

Title IX "pre-assault" claims permit liability "based on a university's response to a general problem of sexual misconduct on campus, rather than to a plaintiff's specific instance(s) of harassment (i.e., post-assault response)." *Roskin-Frazee v. Columbia Univ.*, 2018 U.S. Dist. LEXIS 28937, at *13-14 (S.D.N.Y. Feb. 21, 2018).[9] Nevertheless, like all Title IX claims as set forth above, pre-assault cases still require a showing that the funding recipient was "deliberately indifferent to sexual harassment, *of which [it] ha[d] actual knowledge*," *Davis*, 526 U.S. at 629 (emphasis added), "since whether the [recipient's] actions were clearly unreasonable must be measured by what was known." *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1287 (11th Cir. 2003). And, like all Title IX claims, deliberate indifference in pre-assault cases still "must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. 644-45 (quotations and citation omitted).

In this regard, actual knowledge in a pre-assault liability case has been held to mean "actual knowledge of sexual assault(s) committed in a *particular* context or program or by a *particular* perpetrator or perpetrators." *Roskin-Frazee*, 2018 U.S. Dist. LEXIS 28937, at *14 (emphasis in

---

[9] Only one case in the D.C. Circuit appears to have addressed an express claim of "pre-assault deliberate indifference." *See Raihan*, 324 F. Supp. 3d at 109.

original). Making a general allegation that a university was aware of past incidents of assault on campus does not suffice. *Id.* at *16 ("[S]omething more than [a] general knowledge of assaults campus-wide (i.e., some greater specificity) is required to satisfy the actual knowledge requirement [for Title IX liability]") (citation ommitted); *see also Doe v. Bibb Cty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1309 (M.D. Ga. 2015) (granting summary judgment to defendant on plaintiff's pre-assault Title IX claim because "actual knowledge has to mean something" and plaintiff did not establish defendant's knowledge of harassment committed in a particular context or by a particular perpetrator), *aff'd*, 688 F. App'x 791 (11th Cir. 2017). To hold otherwise would require schools to "purge" themselves of peer harassment to avoid liability, which the Supreme Court has clearly stated is not required. *Davis*, 526 U.S. at 648.

Two circuit court cases are instructive on this point: *Simpson v. University of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007) and *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007). The *Simpson* case addressed the question of actual knowledge about a *particular* program, while the *Williams* case addressed the question of actual acknowledge about a *particular* perpetrator.

In *Simpson*, the defendant university had prior knowledge of a heightened risk of sexual assault within its football recruiting program, specifically the football program's practice of encouraging female students to serve as escorts for recruits and to "show them a good time." *See* 500 F.3d at 1180. The recruiting program had been the subject of media reports and attention from law enforcement in years prior, including the county District Attorney and his staff who met with university officials because a high school student had reported being sexually assaulted in connection with the recruiting program. *Id.* at 1182. The D.A. and his staff expressed concern to the university about the recruiting program, told the university officials that the high school

student's "assault wasn't isolated and indicated a real problem from which people at [the university] were turning their heads," and told the officials that specific changes needed to be made in the program. *Id*. (internal quotations omitted). Yet, even with such warnings, "[d]eposition testimony of three players suggest[ed] that player-hosts still received little or no direction on appropriate behavior or responsibilities." *Id*. And while the university prepared a handbook for the football program addressing player behavior, "[t]he handbook [did] not…address the risk of sexual assault or harassment in the recruiting program, and did not provide guidance to player-hosts on appropriate behavior by themselves and recruits." *Id*. at 1183. The court found that the university's lack of a response, given the specific, actual knowledge it had about sexual assault in the recruiting program, violated Title IX. *Id*. at 1184-85.

In *Williams*, the plaintiff alleged that she had been sexually assaulted by a student-athlete named Cole, whom the university had specifically recruited. The plaintiff there alleged that university officials knew about prior incidents of sexual harassment by Cole, including one at his previous school in which he "sexually assaulted two part-time employees of the college's athletic department…" *Id*. at 1290. Despite this awareness, university officials recruited Cole for the school's basketball program through a "special admissions policy" because he "did not meet UGA's standards for admission" and awarded him a full scholarship. *Id*. The court there determined that the defendants' "preexisting knowledge of Cole's past sexual misconduct" was "relevant when determining whether [plaintiff] alleged facts sufficient to survive the defendants' motion to dismiss her Title IX complaint." *Id*. at 1293 (emphasis added).

*Simpson* and *Williams* represent the type of limited circumstances in which Title IX pre-assault liability claims can survive. But where a plaintiff, like Jane Doe here, fails to plead that the school has actual knowledge of sexual assaults committed by a *particular* perpetrator (*Williams*)

or in a *particular* program (*Simpson*), courts have readily dismissed pre-assault liability claims. *Marino v. State Univ. of N.Y. at Buffalo*, No. 23-CV-1064-JLS-LGF, 2024 U.S. Dist. LEXIS 110071, at *19-20 (W.D.N.Y. June 21, 2024) ("Generally, courts have refrained from imposing Title IX liability based on a university's official policy. Only in a limited number of cases have courts found Title IX liability based on pre-harassment deliberate indifference…") (citations omitted).[10]

In the single pre-assault indifference case in the D.C. Circuit, *Raihan v. George Wash. Univ.*, this Court addressed a plaintiff's allegation that "the University actively created and was deliberately indifferent to a culture of sexual hostility and violence." 324 F. Supp. 3d at 109. The plaintiff there did not refer to any specific cases other than her own "alcohol-infused" assault, but she "argue[d] that the University ha[d] 'an official policy of indifference to sexual misconduct,'

[10] *See*, *e.g.*, *Moore v. Regents of the University of California*, No. 15-CV-05779-RS, 2016 2016 U.S. Dist. LEXIS 67548 (N.D. Cal. May 23, 2016) (rejecting plaintiff's reliance "on general allegations regarding the university's inadequate response to sexual violence" and finding plaintiff "[did] not allege the university had any specific knowledge of a heightened risk of sexual assault either by [the perpetrator] or in the particular context in which the assault"); *Moore v. Regents of the University of California*, No. 15-CV-05779-RS, 2016 U.S. Dist. LEXIS 125905 (N.D. Cal. Sep. 15, 2016) (finding that, even though amended complaint alleged "two [prior] incidents" of assault, plaintiff still failed to allege "the university had any specific knowledge of a heightened risk of sexual assault either by the assailants or in the particular context in which the assaults occurred" and otherwise failed to allege any official policy on which pre-assault deliberate indifference claim could proceed); *Doe v. Bibb County School District*, 83 F. Supp. 3d 1300 (M.D. Ga. 2015) (finding pre-assault Title IX claim insufficient where plaintiff did not establish knowledge on part of defendant beyond "two past instances of sexual harassment involving different students, different scenarios, and, in one case, different schools within [the recipient's] system," noting that "actual knowledge has to mean something" and that "[i]n the absence of a common perpetrator (or a victim of ongoing harassment), there must be another similarity to alert a defendant of a substantial risk of harassment to other students"); *Roskin-Frazee*, 2018 U.S. Dist. LEXIS 28937 (rejecting plaintiff's allegations of "a general policy of deliberate indifference which includes pressuring victims…, failing to adequately train…, and failing to meaningfully discipline students" because complaint failed to allege facts that defendant "had specific knowledge of a heightened risk of sexual assault either by her assailant or in the particular contexts in which her assaults occurred, such as an official university policy or program").

which 'amounted to an intentional violation of Title IX.'" *Id.* (citations omitted). In support, her "most damning allegation" was that the university had agreed to adopt a policy specific to sexual assault following a federal investigation and then failed to apply that policy in practice. *Id.* at 109. She further alleged that a 2014 survey put the university on notice that students were unsatisfied with its handling of sexual misconduct. *Id.* at 110.

While noting that "the requirement of adequate notice does not apply" where "a school intentionally violates Title IX's plain terms, perhaps through some official policy," *id.* at 109, the Court also explained that "the leading cases [applying the Supreme Court's 'official policy' logic] have [still] focused on existing knowledge of specific prior sexual assaults." *Id.* at 110 (citing *Simpson*, 500 F.3d at 1180-1185, and *Williams*, 477 F.3d at 1295-96). With this backdrop, the Court found that the plaintiff "ha[d] not provided enough information to plausibly allege that the University intentionally violated Title IX" as "[t]here [were] no…specific allegations of official school conduct" comparable to those in *Simpson* and *Williams*. *Id.* at 109 (citing *Simpson*, 500 F.3d at 1178; *Williams*, 477 F.3d at 1295-96).

In response to the plaintiff's reliance on *Tubbs v. Stony Brook Univ.*, 2016 U.S. Dist. LEXIS 28465 (S.D.N.Y. March 4, 2016), for the holding that "'knowledge of an increase in sexual assaults on campus, combined with notice that [] policies and responses to sexual assaults are deficient and a subsequent failure to remedy the deficiencies' could satisfy basic pleading standards," the Court noted how "*Tubbs* also concluded, relying on *Simpson*, that 'in order for a university to violate Title IX through a policy of deliberate indifference, it must have actual knowledge of a heightened risk that is specific enough to allow it to remedy such a policy.'" *Id.* at 110 (quoting *Tubbs*, 2016 U.S. Dist. LEXIS 28465, at *8 and 9). To that end, even crediting the plaintiff's allegation that the university had failed to apply its newly adopted sexual misconduct policy and

that the university was on notice of its students' dissatisfaction, the Court found that "there [was] still no credible allegation that the University *intended* to create impunity for sexual harassment or assault" and that the plaintiff ha[d] only plausibly alleged negligence, not intent." *Id.* at 109-110 (emphasis in original). In holding that the plaintiff's complaint "[did] not provide well-pleaded facts that would permit a plausible inference that the University had [ ] knowledge [of a heightened risk]," the Court further commented that "[g]eneralized claims of bad sexual misconduct policy—with the only specific incident coming in the form of Ms. Raihan's own case—would not satisfy even *Tubbs*' standard." *Id.* at 110.

Here, Plaintiff's allegations in support of her pre-assault deliberate indifference claim are even more threadbare than those that were rejected in the foregoing litany of cases. All Plaintiff alleges – in nothing but bald, conclusory fashion – is that CUA "had actual knowledge prior to Plaintiff's rape that its policies and procedures…made female students vulnerable to on-campus rapes" and "knowledge that it suffers from a pattern and practice of older male athletes raping female freshman too intoxicated to consent." Compl., ¶ 69. But Plaintiff does not allege any specific facts of actual knowledge on the part of CUA as to any a heightened risk of sexual assault by Roe or in any particular plausible context.[11] Nor does she allege that her assault occurred within the context of an official school program, such as the recruitment program in *Simpson*; rather, as

---

[11] The closest thing to a particular "context" that can possibly be gleaned from the Complaint would be that of assaults committed by "male athlete students" on "female students" with alcohol involved. Sadly, this refers to the majority of sexual assaults among college-aged students across the country. *See Helfman v. Ne. Univ.*, 485 Mass. 308, 323-24, 149 N.E.3d 758, 773-74 (2020) (noting that "studies do reflect that…[o]ver half of all college sexual assaults involve alcohol and alcohol is the number one drug used to facilitate sexual assault" and "based on a report by a Department of Health and Human Services task force, that approximately 70,000 college students are victims of alcohol-related sexual assault annually in the United States") (quotations omitted) (brackets in original). This is hardly the type of context upon which Plaintiff could allege CUA was on actual notice of a heightened risk of sexual assault.

alleged, it arose from what appeared to begin as a typical interaction between two students at an off-campus party and then a dormitory room. Compl. at ¶¶ 1-2 and 18-22. Other than the bald, conclusory allegation of "male Catholic University athletes sexually assaulting inebriated female freshman," Compl., at ¶ 9, Plaintiff does not allege that CUA was aware of any likelihood that Roe would carry out an assault, as in *Williams*, or any specific factual allegations that students situated similarly to him were more likely to do so. Nor does Plaintiff allege any specific facts that CUA knew that women in her situation were more likely to be assaulted, as was the case with the hosts in *Simpson* – other than her bald, conclusory allegation that "inebriated female students [were] vulnerable to on-campus rapes by male athletes." Compl., at ¶ 10. Plaintiff's allegations – at the very best – amount to the same type of "general policy of deliberate indifference" and "general allegations regarding [a] university's inadequate response to sexual violence" that courts have routinely rejected as insufficient to support a pre-assault deliberate indifference claim. Her allegations do not come close to the facts in any of the cases cited above in which courts found sufficient allegations or evidence of pre-assault Title IX liability.

The two prior Title IX lawsuits against CUA cited in the Complaint provide no help to Plaintiff's pre-assault claim. Specifically, in support of her allegation that there is a "history" of older male CUA athletes sexually assaulting female students, Plaintiff refers to *Cavalier v. Catholic Univ.*, 1:16-cv-2009 (D.D.C.) and *Latham v. Catholic Univ.*, 1:08-cv-1852 (D.D.C.). These two suits were filed in 2016 (*Cavalier*) and 2008 (*Latham*) – i.e., 17 and 9 years ago, respectively. Plaintiff cannot plausibly allege that two instances of alleged sexual assault (other than her own) over the course of nearly two decades, with the most recent one being nearly an entire decade ago, constitute a "history" or a "pattern and practice" of older male athletes assaulting female students, or that CUA was therefore on actual notice of any heightened risk of sexual assault

in any such "context."[12] Ultimately, Plaintiff fails to sufficiently allege any specific facts supporting the contention that CUA knew inebriated female students were vulnerable to assault by male athletes.

Plaintiff otherwise attempts to bolster her general, conclusory allegation of female students being susceptible to assault by male athletes by alleging that CUA is tolerant of and fails to enforce violations of school rules and policies on alcohol, drug use, and late-night dormitory visits by opposite sex students. But, once again, Plaintiff fails to allege a single fact in support of this contention setting forth any instance of any action or inaction by CUA, or even any violations of such school rules or policies other than her own and Roe's on the night in question. Moreover, "inappropriate behavior of a different nature than the eventual harassment cannot give rise to actual knowledge for Title IX purposes." *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016) (citing *Gebser*, 524 U.S. at 291). Plaintiff alleges no facts of behavior or conduct on the part of anyone that would have put CUA on the type of actual notice required to support an actionable Title IX pre-assault claim.

In a case akin to this one, the U.S. District Court for the District of Connecticut recently rejected a pre-assault deliberate indifference claim based on the same theory as Count I here. *Courtois v. Cent. Conn. State Univ.*, No. 3:22-cv-01249 (KAD), 2023 U.S. Dist. LEXIS 171327

---

[12] The two cases are also factually distinguishable from the "context" Plaintiff attempts to allege. Contrary to Plaintiff's allegations and insinuations, in *Cavalier*, both Ms. Cavalier and Mr. Doe were first-semester freshman, and both were athletes with Ms. Cavalier being on the lacrosse team and Mr. Doe on the football team. *See Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 18 (D.D.C. 2018). In *Latham*, meanwhile, only one of Ms. Latham's assailants was a Catholic University student, while two were students at the University of Delaware and one was a student at the University of Maryland. *See* 1:08-cv-1852 (D.D.C.), Am. Compl., ECF No. 2, at ¶¶ 11-14. They, too, were all freshmen at their respective schools, and only one of the assailants was alleged to be an athlete. *Id*. at ¶¶ 9, 10-14, and 44.

(D. Conn. Sep. 26, 2023). There, the plaintiff alleged – with significantly more detail than alleged here – that her assault occurred in the context of numerous violations of university policies related to entering dormitories, alcohol consumption, and student gatherings and conduct in dormitories. *Id*. at *3-6 and 16. She further alleged that the university was aware of ongoing violations of these policies and restrictions and, based on statistics, training, and other information provided by the university to students (which were alleged in the complaint), "was aware that on campus social gatherings involving the excessive consumption of alcohol created a high risk for 'nonconsensual sexual contact' with female undergraduate students." *Id*. at *16.

Even with the far more extensive facts pled there, the Court in *Courtois* held "[t]hese allegations are not actionable," finding that the complaint did not "adequately allege that [the university] had actual knowledge of the assault or risk of assault before it occurred." *Id*. at *15-16. Noting the plaintiff did not allege that she had "any prior interaction with her assailant which she reported to [the university]" or any "prior interaction with her assailant at all" or that "her assailant [w]as a member of a specific group known to the University to pose a risk of sexually assaulting other students to include [herself]," the Court found the plaintiff alleged only that the university "was aware generally of the risk of sexual assaults on campus and that sexual assaults occurred not only on [the university's] campus but on campuses across the nation." *Id*. at *16. In response to the plaintiff's allegations that the university "was aware that students were violating the rules, policies, and/or restrictions" and that "the knowledge that the policies were being violated on the night of the assault, coupled with the knowledge of the 'irrefutable statistical correlation between alcohol consumption and student versus student sexual assault,' suffice[d] to plausibly allege actual notice for purposes of Title IX liability," the Court disagreed and found they amounted only to "constructive notice…[of] an increased risk that a student-on-student sexual

assault might occur" – as opposed to "actual knowledge that Plaintiff's assailant posed a risk of sexual assault to Plaintiff or to any specific person." *Id.* at *17-18. Noting that "[t]he knowledge requirement is designed to create liability arising from a school's inaction in the face of a known risk to Plaintiff," the Court stated that "to find 'actual knowledge' under these circumstances would be to eviscerate the requirement entirely." *Id.* at *18 (citing *Gebser*, 524 U.S. at 290). This is the precise analysis applicable here, and the Court should dismiss Count I for the same reasons.

Lastly, Plaintiff also fails to allege any facts in support of her otherwise bald, conclusory contention that "the University's deliberate indifference contributed to a hostile educational environment denying Plaintiff access to educational opportunities." Compl., ¶ 69. She alleges absolutely nothing in this respect – *e.g.*, no allegation as to what constituted or created a "hostile educational environment" for her, no allegation as to what educational opportunities she was denied or could not access, no allegation that Roe ever contacted her in violation of his no-contact order or that she ever even encountered him again on campus, and no allegation that she could not attend class, participate in any particular program or activities, or avail herself of any campus amenities. "A damages action 'will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'" *Raihan*, 324 F. Supp. 3d at 112 (quoting *Davis*, 526 U.S. at 633). Her assault alone, without more, does not suffice for this purpose. *Raihan*, 324 F. Supp. at 108 ("Peer harassment…is not as likely…to have the 'systemic effect' on educational access necessary to create liability, especially if there is only one incident of harassment.") (quoting *Davis*, 526 U.S. at 652-53). While Plaintiff recites this language, "'[t]hreadbare recitals of the elements of a cause of action…do not suffice," and "the Court [should] give[ ] no weight to [Plaintiff's] legal conclusion that she was '…exposed to a sexually hostile environment' or '…barred…access to educational opportunities."

*Id.* Just as she has failed to do for the elements of actual knowledge and deliberate indifference, Plaintiff has failed to sufficiently allege the denial of educational opportunity.

Like this Court concluded in *Raihan*, "this case has very different facts from *Simpson* and *Williams*, and [Plaintiff] has not provided enough information to plausibly allege that the University intentionally violated Title IX" in order to sufficiently state a claim for pre-assault deliberate indifference. 324 F. Supp. 3d at 109. "There are no comparable specific allegations of official school conduct." *Id.* And like the Court found in *Courtois* (where the plaintiff plead far more factual detail than here), Plaintiff's Complaint does not "adequately allege that [CUA] had actual knowledge of the assault or risk of assault before it occurred" or "actual knowledge that [Roe] posed a risk of sexual assault to Plaintiff or to any specific person." 2023 U.S. Dist. LEXIS 171327, at *15 and 18. Her "allegations are not actionable" and "to find 'actual knowledge' under these circumstances would be to eviscerate the requirement entirely." *Id.* at *16 and 18. Nor has Plaintiff sufficiently alleged the denial of any educational opportunity or benefit. Plaintiff cannot plausibly allege a claim of pre-assault deliberate indifference under Title IX, and Count I should be dismissed, with prejudice, for failure to state a claim.

3. *Count II fails to state a claim for post-assault deliberate indifference.*

Under Count II, Plaintiff alleges post-assault deliberate indifference based on Mr. Morris's reversal of the Hearing Board's decision finding Roe responsible. According to the Complaint, Mr. Morris's decision was "arbitrary and capricious, contrary to University policy, and motivated by a desire to protect the University." Compl. at ¶ 42; *see also id.* at ¶ 71. Plaintiff claims Mr. Morris relied on "weak and self-interested reasons" and "flimsy bases" in "reject[ing] Plaintiff's allegations of sexual assault" and "revers[ing] the board's decision despite overwhelming evidence." *Id.* at ¶ 71. Plaintiff alleges "[t]hese actions demonstrate the University's deliberate

indifference to its procedural obligations under Title IX." *Id.* Notably, the Complaint makes no allegations with respect to CUA's initial response or handling of her sexual assault report, the timing, scope, or any other aspect of CUA's investigation, or the initial Hearing Board's procedures or decision. Instead, Count II for post-assault deliberate indifference is based solely on Mr. Morris's decision in response to Roe's appeal (before any further action could be taken – as explained below).

As set forth above, upon notice of an alleged sexual assault, a funding recipient's duty under Title IX is simply to respond in a way that is "not clearly unreasonable." Here, the facts gleaned from the Complaint and the documents integral to it demonstrate that:

- Immediately upon learning of Plaintiff's sexual assault allegation in the early morning hours of October 19, 2024, Plaintiff's resident advisor and/or community director notified CUA security (Compl., at ¶ 28);

- Plaintiff underwent a Sexual Assault Nurse Examination the next day, October 20 (Compl., at ¶ 31);

- That same day, October 20, Roe was issued a "no-contact" order prohibiting any contact between him and Plaintiff (which Roe was observed to have interpreted broadly as applying to Plaintiff's friends as well and to have been "cautious about any contacts with [her] friends") (Exh. B, at 6 n.3);

- On the same day it received Plaintiff's formal complaint, October 25, CUA issued formal notice to both her and Roe, which described the allegations, the grievance process, and available support services (Exh. A, at 2);

- CUA then immediately initiated and conducted "a prompt, unbiased, and equitable investigation," which included interviews of at least eight witnesses (including Plaintiff and Roe) and the collection and review of security camera footage, screenshot messages, photos, and medical records, as well as expert reports and witness statements submitted by both Plaintiff and [Roe] (*Id.*);

- Within just over one month, CUA provided Plaintiff and Roe with a draft investigative report and the associated evidence, and both submitted responses in early January 2025 (*Id.*);

- In late January 2025, just three months after the incident and Plaintiff's report, CUA notified the parties that the matter would be resolved through a Title IX hearing and provided the details related to the hearing (*Id.*);

- Just days later, on February 10, 2025, CUA then sent Plaintiff and Roe its Final Investigative Report and, on February, 24, 2025, held the hearing consistent with its Title IX Grievance Procedures (*Id.*);

- At the conclusion of the hearing, the Hearing Board deliberated and determined that Roe was responsible for the sexual assault alleged by Plaintiff and, in turn, CUA determined that expulsion was the appropriate sanction (*Id.*); and

- CUA also cooperated in the criminal investigation conducted by the D.C. Metropolitan Police and provided information pursuant to a subpoena issued by the Criminal Division of the Superior Court of the District of Columbia. (*Id.*).

Nowhere in the Complaint does Plaintiff allege that any part of the foregoing response to her sexual assault allegation by CUA was "clearly unreasonable." To the contrary, she alleges that the Hearing Board made its findings and decision "quite reasonably" and "gave…good reasons for its findings." Compl., at ¶¶ 5 and 40. Nor does Plaintiff allege that she was subjected to any further sexual assault or harassment by Roe (or anyone else), or that she ever even encountered, saw, or had contact with Roe again after reporting the October 19 sexual assault.[13] Not only was CUA's response not "clearly unreasonable," but it was indeed *eminently reasonable*, and Plaintiff cannot possibly or plausibly plead otherwise.

Perhaps recognizing as much, Count II focuses solely on Mr. Morris's decision on appeal. This alleged theory, however, fares no better for Plaintiff. As an initial, critical point, it is not accurate or sufficient to state only that the Hearing Board's decision was "reversed." In truth, Mr.

---

[13] While Count II alleges that "when the University learned that Plaintiff suffered a rape, the University had a duty to implement safety measures on Plaintiff's behalf…and to offer her related accommodations" but that "[t]he University did not do so," *see* Compl., at ¶ 72, Plaintiff alleges no facts in support of this bald, conclusory allegation. Nor does Plaintiff allege that she suffered any further sexual harassment or assault as a result or how CUA's alleged failure to do so denied her the benefit of any educational program or activity at the University.

Morris overturned the Board's decision *and remanded it for a new hearing*. The Complaint blatantly misrepresents this procedural posture, *see* Compl. at ¶ 8 (alleging "Mr. Morris…gathered and considered new evidence without referring the case for a re-hearing…") and ¶ 48 (alleging that "University policy did not authorize [Mr. Morris] to overturn the original Title IX panel's decision without returning newly obtained evidence for consideration"), while also expressly acknowledging that "a new hearing panel – and not Mr. Morris's unilateral decision-making – was the proper venue." *Id*. at ¶ 50. And that is exactly what Mr. Morris did. *See* Exh. B, at 1 ("Due to the procedural irregularity and the fact that new evidence significantly alters the findings of fact, I am returning the case to a new Hearing Board to consider evidence and determine responsibility."). Based on this reason alone, Count II fails to state a claim because Mr. Morris's reversal of the Hearing Board's decision was not the end of Plaintiff's Title IX case at CUA, and Plaintiff cannot plausibly allege that CUA was deliberately indifferent to her sexual assault based solely on her inaccurate contention that Mr. Morris just "reversed" the Hearing Board's decision.[14]

In any event, as acknowledged and referenced in the Complaint, CUA has "established procedures for appealing Title IX grievances," which include the right for "respondents [and complainants] in sexual grievance proceedings to appeal the findings of the hearing board." Compl. at ¶ 7; *see also* Exh. D, at § IV (Appeals). While the Complaint alleges that appeals are allowed on "two possible bases," Compl. at ¶ 7, the Grievance Procedures actually identify three, along with the following process:

> Either party may appeal a dismissal of the complaint or a finding of by [sic] the hearing board by sending a letter to the Chief of Staff within five business days of receipt of the dismissal notice or the outcome of the hearing board's decision. …The appeal must specify grounds that would justify consideration.

---

[14] As stated above, the only reason Plaintiff's case did not proceed to the new Hearing Board is because she withdrew from CUA and expressly declined to participate in any new hearing.

> General dissatisfaction with the dismissal or outcome of the proceeding or an appeal for mercy are not appropriate grounds for appeal. The written appeal must specifically address at least one of the following criteria:
>
> - Procedural irregularity that affected the outcome of the matter
> - New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter;
> - Evidence showing a Title IX Coordinator, investigator, or decision-maker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that affected the outcome of the matter.
>
> The University will notify the other party in writing when an appeal is filed and allow that party five business days to send a letter to the Chief of Staff supporting the dismissal or outcome of the hearing board. The Chief of Staff may consult other University officials as appropriate before making his/her decision, but shall not gather additional evidence or speak to any of the individuals who provided evidence or testimony at the hearing. If the Chief of Staff believes that new evidence, previously unknown to either party, significantly alters the finding of fact, the Chief of Staff may return the case to the board or, at his/her sole discretion, a board with some or all new members, to hear more evidence. Such a hearing shall occur in the presence of the complainant and respondent and follow all of the procedural rules of a regular hearing. The Chief of Staff may not return the case to the board only for the purpose of reconsidering its original decision.
>
> The decision on the appeal is final and shall be conveyed in writing to both parties, normally within 10 business days of receipt of the response from the party opposing the appeal. The decision will describe the rationale for the appeal outcome. Both parties will receive the written appeal decision simultaneously. Sanctions are not appealable and may only be altered if a finding of responsibility is overturned.

Exh. D, at § IV (Appeals).

As further acknowledged through the Complaint's allegations, this is the exact process that occurred here. Roe appealed the Hearing Board's determination, and Mr. Morris, as CUA's Chief of Staff, adjudicated the appeal. *See* Exh. B. Roe, in fact, appealed "based on all three criteria." *Id*. at 2. Regarding the new evidence submitted by Roe, it "consist[ed] of statements from five University students on core issues relating to the allegations," namely "five friends of [Plaintiff], including two who were with [Plaintiff] immediately after the alleged sexual assault, and provided

information favorable to [Roe's] appeal." *Id*. This was evidence that *Roe submitted to Mr. Morris* in support of his appeal, not that Mr. Morris "gathered" on his own volition. *Id*. Mr. Morris further found that this new evidence was not reasonably available to Roe at the time of the original Title IX hearing. *Id*. at 5-6. Ultimately, Mr. Morris found in favor of Roe on his appeal for "one procedural irregularity" (while denying others asserted by Roe), *id*. at 6-9, and on the grounds of new evidence that could impact the findings of fact, *id*. at 2-5, while also finding against Roe on his assertion that the original Title IX board was biased against him. *Id*. at 9-10. Despite alleging in conclusory fashion that Mr. Morris "failed to follow the University's established procedures for appealing Title IX grievances" and "reversed the Title IX hearing panel's decision…in violation of University policy," *see* Compl., at ¶¶ 7 and 71, Plaintiff does not and cannot allege any plausible facts in support of such a contention. Nothing in Count II (or elsewhere in the Complaint) properly or sufficiently alleges, nor can Plaintiff plausibly allege, that CUA's adjudication of Roe's appeal was clearly unreasonable.[15]

Count II otherwise alleges that CUA was deliberately indifferent as a result of Mr. Morris overturning the Hearing Board's decision for "weak and self-interested reasons," claiming he improperly relied on "hearsay and double-hearsay" statements about a sexual encounter between Plaintiff and her ex-boyfriend in the days leading up to the October 19 incident, on Plaintiff's

---

[15] Even if Plaintiff could plausibly allege Mr. Morris (or anyone else) failed to follow CUA's Title IX Policy or Grievance Procedures perfectly, "a school's failure to comply with its own internal policies does not itself establish deliberate indifference, just as a school's failure to comply with federal regulations does not do so." *Greene v. Friendship Pub. Charter Sch., Inc.*, Civil Action No. 16-00901 (ESH), 2019 U.S. Dist. LEXIS 29071, at *28-29 (D.D.C. Feb. 25, 2019) (citing *Raihan*, 324 F. Supp. 3d at 109-10; *Gebser*, 524 U.S. at 291-92.

"misstatement" that she was unaware of her DNA test results,[16] on post-hearing witness statements (which were submitted by Roe in his appeal), and on his own finding that the Hearing Board improperly considered Roe's failure to present character witness testimony. However, as acknowledged through the Complaint, Mr. Morris's findings in these regards were all made in response to issues raised by Roe in his appeal, which Roe was entitled to file.

In that regard, the Department of Education's implementing regulations – which require all funding recipients to institute grievance procedures and which are referenced in CUA's Title IX Grievance Procedures – mandate that university grievance procedures ensure certain "[b]asic requirements." *See* 34 C.F.R. §§ 106.45 and 106.46. These include the requirements to "[t]reat complainants and respondents equitably," to "[i]nclude a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures," and to "[r]equire an objective evaluation of all evidence…including both inculpatory and exculpatory evidence…and provide that credibility determinations must not be based on a person's status as complainant, respondent, or witness," 34 C.F.R. § 106.45(b)(1), (3), and (6), as well as "provid[ing] each party…with an equal opportunity…to access either the…evidence, or the same investigative report that accurately summarizes the evidence" and with the same "reasonable opportunity to review and respond to the evidence or the investigative report." 34 C.F.R. § 106.46(e)(6). The regulations also require that universities "must offer the parties an appeal from a determination whether sex-based harassment occurred," 34 C.F.R. § 106.46(i), must notify the parties in writing of the procedures and

---

[16] On this particular point, Plaintiff's own Complaint expressly admits that "Plaintiff's testimony [to the Hearing Board] that she was unaware of the DNA test results…*was, indeed, misleading*." Compl., ¶ 45 (emphasis added).

permissible bases to appeal, 34 C.F.R. § 106.45(h)(2), and must "[i]mplement appeal procedures equally for the parties." 34 C.F.R. § 106.46(d)(3)(ii).

Here, as alleged in the Complaint, Roe's appeal to Mr. Morris was a right afforded to him under the CUA Title IX Grievance Procedures (consistent with the foregoing federal regulations). He exercised that right and asserted various appellate issues, and Mr. Morris ruled on them. Surely Plaintiff is not attempting to allege that CUA engaged in deliberate indifference under Title IX by seeking to ensure due process and fairness to all parties involved – consistent with the federal regulatory obligation to ensure "basis rights" are protected equally among the parties.

In reality, Plaintiff's "claim" for post-assault deliberate indifference amounts to nothing more than her own personal disagreement with Mr. Morris's findings and decision, and she effectively seeks to have the Court substitute its judgment for that of Mr. Morris. *See*, *e.g.*, Compl., at ¶ 56. ("The University's chief of staff then failed to hold Plaintiff's assailant, Defendant Roe, responsible for his actions, in a further violation of Title IX.").[17] Of course, this is not the Court's role, and a claim for post-assault deliberate indifference cannot be sufficiently stated on such grounds. As clearly admonished by the Supreme Court, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. "[R]ecipients need not…'engage in particular disciplinary action,'" and "[v]ictims…have no 'Title IX right to make particular remedial demands.'" *Doe*, U.S. App. LEXIS 21086, at *20 (quoting *Davis*, 526 U.S. at 648).

---

[17] Once again, it must be kept in mind that Mr. Morris's decision on Roe's appeal was but one step in CUA's Title IX process. As noted above, Mr. Morris specifically referred the case to the Dean of Students for additional proceedings consistent with his opinion, specifically for a new Hearing Board to consider the evidence and the question of Roe's responsibility. As the CUA Chief of Staff, Mr. Morris sat in the capacity as the appellate hearing officer, and his responsibility was to fairly and equitably adjudicate any appeals submitted in the matter – whether by Plaintiff or Roe or both – not just to "hold…Defendant Roe[ ] responsible for his actions."

The Sixth Circuit has applied these principles in context with a plaintiff's claim that a university administrator's decision on appeal constituted deliberate indifference. In *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613 (6th Cir. 2019), when the plaintiff reported that a male student sexually assaulted her, the university conducted an investigation that found sexual assault occurred and expelled the male student. 944 F.3d at 625. The male student appealed which the university denied, but when he appealed again the Vice President for Student Affairs set aside the previous findings and ordered a new investigation be conducted by an outside law firm, which found no sexual assault occurred. *Id*. The plaintiff claimed that the Vice President's response was deliberately indifferent. *Id*. The Court found that "[the plaintiff's] theory fundamentally contradicts *Davis*," articulating:

> *Davis* explained that "[s]chool administrators will continue to enjoy the flexibility they require" in conducting investigations and imposing discipline, and "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Particularly prescient here is the *Davis* dissent's comment that "[o]ne student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process," putting the school in a position where it is "beset with litigation from every side." Such were [the Vice President's] "particular circumstances," as she was caught between [the plaintiff's] demand for judgment and punishment on one side and the accused male student's appeal for additional due process on the other.
>
> [The plaintiff] is clearly dissatisfied with [the Vice President's] decision to overturn the male student's punishment (expulsion), which also served as [the plaintiff's] remedy. But [the plaintif] has no "right" to her preferred remedy. *Davis* expressly denied the prospect "that administrators must engage in particular disciplinary action," and stressed that the victim does *not* "have a Title IX right to make particular remedial demands." [The plaintiff] claimed a right to be free from student-on-student discrimination and predicated the alleged violation of that right on her belief that [the Vice President's] decision about the punishment (her remedy) was deliberately indifferent. But [the plaintiff] has pointed us to no legal principle or precedent that clearly prohibits [the Vice President's] otherwise discretionary decision under these "particular circumstances."

*Id*. at 627 (citations omitted). The same holds true here. Plaintiff's belief that Mr. Morris's decision on Roe's appeal was "flimsy" or "weak" or "self-interested" is a far cry from pleading a factual

basis for finding that CUA's response to her assault was clearly unreasonable, and it does not give rise to sufficient factual basis on which a claim for post-assault deliberate indifference can be stated. Plaintiff cannot plausibly allege a claim of post-assault deliberate indifference under Title IX, and Count II should be dismissed, with prejudice, for failure to state a claim.

B. Plaintiff fails to state a claim for gross negligence or negligence *per se*.

Plaintiff alleges that CUA was negligent based upon various common law negligence doctrines, including *res ipsa loquitur*, *in loco parentis*, and negligence *per se*, none of which are applicable here. In the District of Columbia, the three elements of a negligence claim are: (1) a duty owed by the defendant to protect plaintiff from injury; (2) failure to fulfill that duty; and (3) injuries to plaintiff proximately caused by defendant's failure to meet the duty. *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). Plaintiff has failed to sufficiently plead the existence of any duty owed to her by CUA and, accordingly, Counts III and IV should be dismissed.

1. *Count III fails to state a claim for gross negligence*.

First, in claiming that CUA was grossly negligent by creating a dangerous environment for female freshmen students, Plaintiff alleges that CUA possessed an affirmative duty to protect her from sexual assault by CUA athletes, including a duty to properly warn, train, and educate University students and staff how to avoid sexual assault, and if necessary, to fairly resolve sexual assault complaints. Plaintiff bases this purported duty of CUA on two theories: *in loco parentis* and *res ipsa loquitur*. *See* Compl., at ¶ 74. In so claiming, Plaintiff contends that the university-student relationship is a "special relationship" that itself creates a duty to protect students, including her. *Id*. She is mistaken.

The first element of a common law negligence action is the establishment of a duty of care. *Smith v. District of Columbia*, 413 F.3d 86, 109 (D.C. Cir. 2005). It is well settled that the

determination of whether a legal duty exists is a question of law. *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1274 (D.C. 1987). In the District of Columbia and elsewhere, the existence of a duty "is determined, in large part, by the nature of the relationship between the parties." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 794 (D.C. 2011). Plaintiff's claim that the duty to take reasonable measures to protect students from being "raped by athletes" is not a duty founded in law. Indeed, courts in the District of Columbia recognize the general rule "that the relationship between a university and its students is contractual in nature." *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977). This principle has been frequently applied when analyzing the student/university relationship. *See*, *e.g.*, *Manago v. District of Columbia*, 934 A.2d 925, 926 (D.C. 2007); *Pride v. Howard University*, 384 A.2d 31, 34 (D.C. 1978); *Long v. Howard University*, 439 F.Supp.2d 68, 80 (D.D.C. 2006). Here, the agreement between the parties is that CUA would provide a Catholic education for Plaintiff in exchange for her parents' payment for tuition, room, and board of approximately $50,000. *See* Compl., at ¶ 74.

The District of Columbia generally bars tort claims arising out of contractual relationships. In order for a tort claim to stand when the parties maintain a contractual relationship, "the tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Rayner v. Yale Steam Laundry Condo. Ass'n*, 289 A.3d 387, 399 (D.C. 2023) (quoting *Choharis v. State Farm Fire and Casualty Co.*, 961 A.2d. 1080, 1089 (D.C. 2008)). Accordingly, "[t]he tort must stand as a tort even if the contractual relationship did not exist." *Id*. This Court has previously rejected students' attempts to establish that the institute of higher education that they attended owed a tort duty independent of the contractual relationship. *See St. Peter v. Georgetown Univ.*, 707 F. Supp. 3d 17, 25 (D.D.C. 2023); *Amin v. Nyack Sch. of Adult & Distance Educ.*, 710 F. Supp. 2d 80, 83 (D.D.C. 2010). Here,

Plaintiff's attempts to establish a duty separate from CUA's contractual obligations to her must also fail as all of the purported tortious conduct arises out of her contractual relationship with CUA.

An exception to this general rule is where a "special relationship" exists; however, courts have held there is not a "special relationship" between a university and student that, itself, creates a duty to protect students from a third party. Plaintiff's attempt to assign the outdated duty of *in loco parentis*, which courts have long since refused to impose on universities, is unpersuasive. Indeed, "absent a special undertaking or during a school-sponsored activity," none of which is alleged here, "the general rule across all states is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Chen v. Hillsdale Coll.*, 150 F.4th 735, 742 (6th Cir. 2025) (quoting *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003)); (citing *Guest v. Hansen*, 603 F.3d 15, 21 (2d Cir. 2010) (explaining that colleges "do not act in loco parentis"); *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 245 (3d Cir. 2010) ("[T]he idea that public universities exercise strict control over students via an *in loco parentis* relationship has decayed to the point of irrelevance.").

Given the foregoing, whereby any purported damages are contractual in nature and CUA cannot be found liable to harm caused by a third-party over which it did not exert control, there is no basis for Plaintiff's theory that a cause of action sounding in negligence should be sustained under the doctrine of *res ipsa loquitur*. "For *res ipsa loquitur* to apply: (1) the event must be of the kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of plaintiff." *Williams v. Aviles*, No. 24-7004, 2025 U.S. App. LEXIS 4612, at *11 (D.C. Cir. Feb. 26, 2025) (quoting *Bell v. May Dep't Stores Co.*, 866 F.2d 452, 455, 275 U.S. App. D.C. 251 (D.C. Cir. 1989)). To be sure,

where "there is no general duty in tort law to control the conduct of a third person as to prevent him from causing physical harm to another," Roe's purported actions were not within the exclusive control of CUA. *Hoehn v. United States*, 217 F. Supp. 2d 39, 45-46 (D.D.C. 2002) (quoting Restatement (Second) Torts § 315 (1965)); *see also Kohler v. HP Enter. Servs.*, LLC, 212 F. Supp. 3d 1 (D.D.C. 2016) ("there is a general rule of nonliability at common law for harm resulting from the criminal acts of third parties."). Accordingly, Plaintiff's attempt to ground a negligence claim on alleged violations of the University's contractual duties fails to state a claim as a matter of law. Plaintiff cannot plausibly allege a claim of gross negligence, and Count III should be dismissed, with prejudice, for failure to state a claim.

2. *Count IV fails to state a claim for negligence per se.*

Plaintiff bases her cause of action of negligence *per se* on a purported violation of D.C. Code § 25-78(A)(1)-(2). Although this statute does not exist, CUA presumes Plaintiff intended to cite to D.C. Code § 25-781 – sale of alcohol to minors or intoxicated persons. Either way, this argument also fails.

As the District of Columbia Court of Appeals has articulated:

> To prevail on a negligence *per se* theory, the plaintiff may, in certain circumstances and under specified conditions[,] rely on a statute or regulation as proof of the applicable standard of care. Violation of a statute or regulation may constitute negligence per se only if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties.

*Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039-40 (D.C. 2014) (citing *Clark v. District of Columbia*, 708 A.2d 632, 636 (D.C. 1997); *Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009).

The section of the D.C. Code on which Plaintiff relies states as follows:

> (a) The sale or delivery of alcoholic beverages to the following persons is prohibited: (1) A person under 21 years of age, either for the person's own use or for the use of any other person, except as provided in § 25-784(b); or (2) An intoxicated person, or any person who appears to be intoxicated.

D.C. Code § 25-781. Even assuming, *arguendo*, that Plaintiff is a minor and/or was intoxicated at the time, Plaintiff does not allege, nor can she, that CUA sold or delivered alcohol to her. Even assuming that Plaintiff was delivered alcohol at CUA-owned properties, which, at least in regard to the "rugby house," she was not, Plaintiff herself alleges that it was *Roe* who served her alcoholic beverages, not CUA. *See* Compl. at ¶ 20-22.

Beyond that, however, CUA is not a party over which the D.C. City Council intended to impose liability under the Alcoholic Beverage Control Act ("the Act"). D.C. Code §§ 25-781, *et seq*. This Court has previously found that the only persons over which the Act imposes liability are tavern owners, or holders of retail licenses that sell alcohol on their premises. *Wadley v. Aspillaga*, 163 F. Supp. 2d 1, *10-11 (D.D.C. 2001). In that case, the Court refused to allow a cause of action that would extend liability thereunder to a business host that negligently furnished alcohol to its employees. This Court should similarly refuse to extend liability to CUA here, under even more tenuous circumstances whereby it is not even alleged that CUA hosted or itself furnished Plaintiff alcohol. Because the statutory basis alleged by Plaintiff for her claim of negligence *per se* fails as a matter of law, Count IV must be dismissed for failure to state a claim. Plaintiff cannot plausibly allege a claim of negligence *per se*, and Count IV should be dismissed with prejudice.

## V. **CONCLUSION**

Defendant, The Catholic University of America, respectfully requests that this Honorable Court grant this Motion to Dismiss and enter an Order dismissing Counts I-IV of the Complaint with prejudice.

Respectfully submitted,

Dated: October 29, 2025

*/s/ Michael J. Marinello*

Michael J. Marinello (D.C. Bar No. 1008933)
marinello@kaganstern.com
Veronica J. Mina (D.C. Bar No. 90010619)
mina@kaganstern.com
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(410) 216-7900 (Phone)

*Counsel for Defendant, The Catholic University of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2025, I filed the foregoing using the Clerk's CM/ECF system, which will provide notice to all counsel of record.

*/s/ Michael J. Marinello*

Michael J. Marinello (D.C. Bar No. 1008933)