**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>JOHN ROE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cv-02978-RJL |

**PLAINTIFF JANE DOE'S BRIEF IN OPPOSITION TO DEFENDANT CATHOLIC UNIVERSITY OF AMERICA'S MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

LEGAL STANDARD .......... 3

ARGUMENT .......... 3

I. Plaintiff Roe Adequately Pleads Pre-Assault Deliberate Indifference Based on Defendant CUA's Refusal to Address Known Risks on its Campus. .......... 3

a. Defendant CUA held actual knowledge of risk vectors in parties associated with athletic groups and student dormitories. .......... 4

b. Notwithstanding its written policies, Defendant CUA's practices created an obvious risk of sexual misconduct. .......... 6

II. Plaintiff Doe Pleads Post-Assault Deliberate Indifference Based on Defendant CUA's Failure to Follow Its Own Policy. .......... 8

III. Plaintiff Doe States a Claim for Gross Negligence and Negligence *Per Se*. .......... 12

a. Defendant CUA's breach of its duty to protect students constitutes gross negligence. .......... 12

b. Defendant CUA's flagrant disregard of D.C. Code § 25-781 constitutes negligence *per se*. .......... 16

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 12

*Bd. of Trs. of Univ. of D.C. v. DiSalvo*,
974 A.2d 868 (D.C. 2009) ... 12, 15

*Brodeur v. Claremont School Dist.*,
626 F. Supp. 2d 195 (D.N.H. 2009) ... 8

*Cavalier v. Catholic Univ. of Amer.*,
513 F. Supp. 3d 30 (D.D.C. 2021) ... 8

*Cavalier v. Catholic Univ.,*
1:16-cv-2009 (D.D.C.) ... 4, 5, 6

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999) ... 4, 7, 8

*Doe v. Dominion Bank,*
963 F.2d 1552 (D.C. Cir. 1992) ... 18

*Doe v. Fairfax Cnty. Sch. Bd.*,
1 F.4th 257 (4th Cir. 2021) ... 4

*Doe v. Union Coll*.,
No. 119-CV-284-GLS-CFH, 2020 WL 1063063 (N.D.N.Y. Mar. 5, 2020) ... 13

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ... 3

*Faiaz v. Colgate Univ*.,
64 F. Supp. 3d 336 (N.D.N.Y. 2014) ... 13

*Jarrett v. Woodward Bros.*,
751 A.2d 972 (D.C. 2000) ... 16, 17, 19

*Karasek v. Regents of Univ. of Calif.*,
956 F. #d 1093 (9th Cir. 2020) ... 4

*Kline v. 1500 Massachusetts Avenue Apartment Corp.,*
439 F.2d 477 (D.C. Cir. 1970) ... 18

*Latham v. Catholic Univ.*,
1:08-cv-1852 (D.D.C.) .......... 4, 5, 6

*Majeska v. District of Columbia*,
812 A.2d 948 (D.C. 2002) .......... 17

*Mullins v. Pine Manor College*,
449 N.E.2d 331 (1983) .......... 13, 14, 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) .......... 3

*Raihan v. George Washington Univ.*,
324 F. Supp. 3d 102 (D.D.C. 2018) .......... 6, 7

*Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*,
534 A.2d 1268 (D.C. 1987) .......... 16, 18, 19

*S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*,
819 F.3d 69 (4th Cir. 2016) .......... 4

*Simpson v. Univ. of Colo. Boulder*,
500 F.3d 1170 (10th Cir. 2007) .......... 4, 5

**Statutes**

D.C. Code § 25-781 .......... 16, 17, 18, 20

**Rules**

Fed. R. Evid. 412 .......... 10

## INTRODUCTION

Defendant Catholic University of America ("CUA") ignored the conditions on its campus that led to Plaintiff Doe's rape. Then, after a properly convened hearing board correctly determined Defendant Roe's responsibility, a senior administrator improperly resorted to unreliable evidence contrary to the school's established procedures to vacate the decision. The reason for this action: Defendant CUA's fear that yet another violent sexual assault on a freshman woman by a male athlete on its campus would irreparably harm its reputation as an institution of higher learning that protects and promotes Catholic ideals.

It is unfortunately true that sexual misconduct, especially by male athletes, is a fact of life on university campuses. But liability attaches not based on the mere fact of an assault, but rather based on a particular school's acts or omissions before and after the assault. In this case, Defendant CUA knew for years before the case at bar that alcohol-fueled parties associated with school athletic programs posed a particular risk of student-on-student sexual misconduct victimizing freshman women. And while the university implemented certain policies on paper, its practices demonstrated a much less rigorous level of care. As Plaintiff Doe unfortunately experienced, Defendant CUA allowed underage drinking to continue unsupervised and unmonitored in both its dormitories and, in this case, at the Rugby House—a building affiliated with Defendant CUA's athletic program—despite policies prohibiting such conduct.

The measures meant to curb dangerous sexual conduct in dorms at CUA similarly failed. Instead of enforcing the rule against opposite-sex overnight stays, the CUA employee at Defendant Roe's dormitory building turned a blind eye when Defendant Roe, a football player, showed up late at night with an intoxicated freshman woman. The students were not made to sign in or out,

and Defendant Roe continued to serve Plaintiff Doe more liquor before leading her into his room and violently sexually assaulting her.

Following the assault, a duly constituted hearing board considered evidence submitted by both Plaintiff Doe and Defendant Roe. The board found against Defendant Roe. CUA's Title IX board reasonably found that Defendant Roe raped Plaintiff on the basis of (a) photos of Plaintiff's bruises; (b) medical records of her abdominal, anal and vaginal pain; (c) her immediate blocking of Roe on social media; (d) multiple outcry witnesses' testimonies of Plaintiffs' claim rape; and (e) witnesses' observations of dramatic changes in Plaintiff's personality after the assault. In contrast, the board noted (a) Roe's flat affect, and their incredulity about his claims that he (b) was unaware until he was naked of his alleged flaccidity, and that he (c) observed no bruises on Plaintiff while purportedly dressing and hugging her. Compl. ¶¶ 40-41.

According to CUA, Defendant Roe appealed to Mr. Lawrence Morris, Defendant CUA's Chief of Staff.[1] Contrary to the school's policy, the appeal functioned as a second bite at the apple for Defendant Roe, who submitted multiple statements and other evidence available—but for unknown reasons, not adduced—during the initial hearing. Mr. Morris characterized this evidence as "new" while making a host of assumptions against Plaintiff Doe that exhibited a biased approach to the proceeding, clearly unreasonable under the circumstances.

Ultimately, Mr. Morris vacated the hearing board's determination and returned the case for further consideration. Mr. Morris based his decision upon, *inter alia*, hearsay statements that Plaintiff allegedly had anal sex with a purportedly abusive ex-boyfriend on October 15, 2024, as explaining injuries photographed on October 19. Mr. Morris did not explain how anal sex led to

[1] The Decision on Appeal attached to Defendant CUA's Motion to Dismiss states that Defendant Roe appealed the decision of the Hearing Board. Dkt. 13-3. There is no other evidence of such appeal.

Plaintiff's bruised neck and injured breast, nor how injuries to Plaintiff inflicted around October 15 would not be present on October 18 yet present on October 19. Compl. ¶ 44.

The true reason for Mr. Morris' otherwise inexplicable action: fear that a Catholic institution of higher learning could not suffer yet another high-profile report of a brutal sexual assault of a young woman by a male athlete on its campus. Understandably perceiving the university's bias against her and its agenda to bury her claims, Plaintiff Doe withdrew from Catholic University and subsequently filed this action.

## LEGAL STANDARD

When deciding a motion to dismiss, a court draws all reasonable inferences in favor of the plaintiff. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, *Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). A motion to dismiss should only be granted if after accepting all well-pleaded allegations as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

## ARGUMENT

### I. Plaintiff Roe Adequately Pleads Pre-Assault Deliberate Indifference Based on Defendant CUA's Refusal to Address Known Risks on its Campus.

Defendant CUA contends that the facts in the Corrected Complaint ("Complaint") do not sufficiently establish CUA's deliberate indifference to known risks on its campus that precipitated Plaintiff Doe's assault. This is incorrect. The school's failure to address underage drinking at alcohol-fueled parties within its athletic community, combined with its failure to follow its own policies, meet the standard for pre-assault liability under Title IX.

Although it is true that Title IX presents a high bar for establishing pre-assault deliberate indifference, it is not the case "that only a complete failure to act can constitute deliberate

indifference, or that any half-hearted investigation or remedial action will suffice to shield a school from liability." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016). Even where a school does not facilitate sexual misconduct directly, Title IX prescribes liability where an institution's inaction "causes students to undergo harassment or makes them liable or vulnerable to it" in "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645-46 (1999); *see also Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021) ("[A] school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment ...").

While Title IX does not require universities to completely eradicate sexual misconduct on their campuses, courts find deliberate indifference where a school is aware of recurrent problems in a particular group or context but fails to take remedial action. *See, e.g.*, *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1177-78 (10th Cir. 2007) (finding deliberate indifferent adequately pled where university was aware of, but did not address, recurrent sexual misconduct at recruiting events for the football team); *Karasek v. Regents of Univ. of Calif.*, 956 F. #d 1093, 1113 (9th Cir. 2020) (holding that Title IX imposes liability where a school demonstrates deliberate indifference "in any context subject to the school's control).

**a. Defendant CUA held actual knowledge of risk vectors in parties associated with athletic groups and student dormitories.**

Plaintiff alleges two high-profile instances of rape or sexual assault perpetrated by male athletes against freshman women at CUA—*Latham v. CUA* and *Cavalier v. CUA*[2]—the latter case

[2] *Latham v. Catholic Univ.,* 1:08-cv-1852 (D.D.C.) and *Cavalier v. Catholic Univ.,* 1:16-cv-2009 (D.D.C.).

which continued until 2021. Compl. ¶ 54. These high-profile and factually similar incidents put CUA on notice of particularized risk vectors for purposes of Title IX liability.[3]

The Tenth Circuit's analysis in *Simpson* in instructive in this case. In *Simpson*, the court found that the University of Colorado acted with pre-assault deliberate indifference when it knew of but failed to address a culture of sexual misconduct within (1) a specific school-affiliated athletic group (the football team) and (2) in a specific school-affiliated context (parties in buildings controlled by or affiliated with the football team). 500 F.3d at 1181. Instead of addressing this known risk by, for example, supervising recruiting parties hosted by the football team organization or more stringently policing the distribution and consumption of alcohol, the university turned a blind eye, allowing alcohol-fueled football parties with girls and young women to continue unchecked and unmonitored. *Id.* at 1183 (noting that, following a high-profile incident, another recruit was given marijuana and alcohol, and taken to a strip club).

Defendant CUA exhibited the same disregard towards known misconduct within its athletic community here. Despite previous high-profile instances of sexual misconduct at athletic parties, Defendant CUA failed to implement effective measures to monitor and prevent alcohol consumption and drug use by underage students and at school-controlled facilities like dormitories or the Rugby House. Compl. ¶¶ 18-22, 57. In addition, although Defendant CUA paid lip service to preventative policies regarding alcohol and overnight guests, the events alleged in the Complaint demonstrate that the university did not effectively enforce these policies—instead allowing

---

[3] *Latham* and *Cavalier* are the only cases of CUA freshman women being raped by male athletes yet noted in the Federal Reporter and the WASHINGTON POST. Three such cases, including Plaintiff's assault, are bad enough for a Catholic school: "Once is happenstance. Twice is coincidence. Three times is enemy action" (I. Fleming, *Goldfinger*). The likely existence of further similar cases will be a key subject for discovery if CUA's motion to dismiss fails.

students to come and go freely without complying with school policies. *Id.*; *see* Dkt. 13-1, n.3 (referencing CUA Housing Policy.)[4]

Instead of focusing on Defendant CUA's failure to stamp out sexual misconduct at large, the Complaint here focuses on "existing knowledge of specific prior sexual assaults." *Raihan v. George Washington Univ.*, 324 F. Supp. 3d 102, 110 (D.D.C. 2018). For this reason, Plaintiff Doe adequately pleads Defendant CUA's knowledge of "a heightened risk" of sexual assault on campus for purposes of Title IX liability.

**b. Notwithstanding its written policies, Defendant CUA's practices created an obvious risk of sexual misconduct.**

In light of Defendant CUA's knowledge about specific risk vectors on its campus, Plaintiff Doe adequately pleads deficiencies in the university's pre-assault practices that made Plaintiff more vulnerable to sexual assault.

Although the *Cavalier* and *Latham* cases cited in the Complaint occurred some years ago, their circumstances—involving alcohol-fueled parties leading to sexual misconduct by athletes in university dormitories—stand out as egregious departures from the Catholic values and vision that CUA espouses. Compl. ¶ 55. By October 2024, when Plaintiff Doe found herself at an event affiliated with a university athletic organization, CUA should have taken steps to police underage drinking and mitigate circumstances conducive to sexual misconduct in dormitories. Instead, the

[4] "The University affirms that sexual relationships are designed by God to be expressed solely within a marriage between husband and wife. Sexual acts of any kind outside the confines of marriage are inconsistent with the teachings and moral values of the Catholic Church and are prohibited by the University's Code of Student Conduct. An overnight visit with a sexual partner is prohibited as this type of behavior is incompatible with the mission of the University as well as with the rights of roommates and community members to live in an appropriate and comfortable environment." CUA Housing Policy, Visitation in the Residence Halls, ¶ 8.

events on October 18 and 19, 2024, show that CUA did not take any meaningful steps to prevent similar instances of assault on its campus.

CUA purports to forbid underage drinking and intoxication on its campus and in buildings controlled by student organizations. Compl. ¶ 57. Yet Plaintiff Doe and Defendant Roe—both underage—drank in their respective dormitories and the university-affiliated Rugby House. *Id.* The university's inaction to prevent excessive and underage drinking at locations affiliated with sports programs is even more surprising given that previous high-profile cases of alcohol-fueled rape involved student athletes. The university also purports to prohibit sex within dormitories and track the coming and going of student guests through logs in each building. Compl. ¶ 58. Yet the university employee at Defendant Roe's building ignored these rules and procedures in October 2024. *Id.* Far from the vigilance and rules CUA held out in it its policies, the university's disregard for the circumstances giving rise to the events in October 2024 demonstrates a deliberate indifference to known risk vectors of sexual misconduct.

The conduct in this case is more concrete and particularized than the omissions in *Raihan*. In that case, the court held that George Washington University's failure to implement a sexual assault policy it agreed to adopt was insufficient to demonstrate deliberate indifference under Title IX. *Raihan*, 324 F. Supp. 3d at 109. Here, by contrast, Defendant CUA's deliberate indifference does not relate to a generic preventive policy, but rather to specific conditions within a specific student group and at specific locations (dormitories and the Rugby House) across campus. Compl. ¶¶ 18-26. Rather than relying on "bald, conclusory allegation[s]," Dkt. 13-1, at 17, Plaintiff Doe pleads specific past examples and particularized omissions in "a circumstance over which [Defendant CUA] exercised control over the [assailant] and the environment in which the [assault] occurred." *Davis*, 526 U.S. at 646.

For these reasons, Plaintiff Doe's well-pled facts in the Complaint demonstrate pre-assault deliberate indifference based on Defendant CUA's inaction in the face of specific and known risks of sexual misconduct on its campus.

## II. Plaintiff Doe Pleads Post-Assault Deliberate Indifference Based on Defendant CUA's Failure to Follow Its Own Policy.

Defendant CUA correctly notes that Plaintiff Doe's post-assault deliberate indifference claim is not based on the university's investigation, initial hearing, or actions taken with respect to Defendant Roe. Dkt. 13-1 at 21-22. Rather, Count II of the Complaint focuses on (and adequately pleads Title IX liability for) the university's arbitrary resort to unreliable evidence to vacate the initial determination against Defendant Roe contrary to the school's own procedures and fundamental fairness.

While courts afford universities broad discretion in their disciplinary procedures, a response that is lax, biased or arbitrary can demonstrate deliberate indifference under title IX. *See, e.g.*, *Brodeur v. Claremont School Dist.*, 626 F. Supp. 2d 195, 210 (D.N.H. 2009). In a previous lawsuit against Catholic University about sexual assault on its campus, this District indicated that a hearing process could give rise to a Title IX claim if it was "(1) was biased; (2) had reached a predetermined conclusion; or (3) failed to take [Plaintiff's] arguments and evidence seriously." *Cavalier v. Catholic Univ. of Amer.*, 513 F. Supp. 3d 30, 51 (D.D.C. 2021). A university's response to an allegation of sexual assault cannot be "clearly unreasonable" under the circumstances. *Davis*, 526 U.S. 629, 645 (1999).

Mr. Morris' reversal of the Title IX hearing board's determination reflected a strained reading of the school's policy that favored Defendant Roe and unduly discredited Plaintiff Doe. Under these circumstances, a jury could conclude Mr. Morris' handling of the appeal reflected a clearly unreasonable bias and disregard for the rules. As a result, Plaintiff Doe understandably felt

shut out from her life as a student at CUA given the university's attitude towards her legitimate complaint and the prospect of having to re-live her trauma in front of another contested hearing board.

Mr. Morris' Decision on Appeal cites four pieces of "new" evidence as bases for vacating and remanding the hearing board's decision. Dkt. 13-3. Mr. Morris's report departs from the school procedures—and principles of fundamental fairness—in its presumption that the evidence was "not available" to Defendant Roe at the initial hearing and its outdated assessment of key facts and evidence relating to Plaintiff Doe. Mr. Morris' decision effectively put Plaintiff Doe in the position of having to re-live her trauma during another hearing while giving Defendant Roe a second bite at the apple after he already had a chance to adduce and submit evidence.

First, Mr. Morris cited evidence of Plaintiff Doe's sex with another person prior to the assault. Dkt. 13-3 at 2. Mr. Morris' assessment begins by discounting Plaintiff Doe's testimony regarding abdominal, vaginal and anal pain as "subjective evidence." *Id.* Mr. Morris then cites hearsay evidence from Plaintiff Doe's peers in which they claim that Plaintiff Doe stated that she had sex with another person two to three days prior to the alleged assault and that this person had become physically abusive in past. *Id.* at 2-3. Mr. Morris cites these statements as evidence of a possible alternative source of Plaintiff Doe's injuries. *Id.* at 3. However, Mr. Morris does not address the fact that none of the eyewitness or photographic evidence depicts bruising before the night of October 18, nor does he draw any connection between the prior sex with another individual or the alleged past physical abuse and the specific bruising depicted in photographs of Plaintiff Doe on the morning of October 19. Mr. Morris' analysis—combined with his dismissive attitude towards Plaintiff Doe's testimony—amounts to exactly the type of non-probative evidence offered to show that because a victim consented on one night with one man, she must have also consented

on the night of the alleged assault with yet another man. *See* Fed. R. Evid. 412. This treatment of rape-shield evidence—which could have been discovered by Roe before the initial hearing but for unknown reasons was not—demonstrates an unreasonable bias in the appellate procedure toward Doe and in favor of Roe.

Second, Mr. Morris' decision relied on what he characterized as "new medical evidence." Dkt. 13-3 at 3. But these hearsay statements from Plaintiff Doe's peers could have been elicited during the initial investigation and hearing but, for unknown reasons, was not. Dkt. 13-3 at 3. Indeed, Mr. Morris' memorandum acknowledges that Doe never purported to have submitted to internal swabs of her vagina or anus, but the memorandum nonetheless finds that the hearing board was "left to presume" that the swab results would return specific DNA findings. *Id.* Again, while Mr. Morris characterizes this as "new" evidence, it is not clear why Roe could not elicit it before or during the hearing board since, as the memorandum acknowledges, the hearsay evidence related to statements allegedly made by Doe *before* the board. Furthermore, it is undisputed from the parties' testimony that John Roe claims to have worn a condom during, and that Jane Doe showered after, their sexual encounter. Therefore it is unlikely that any swabs would have recovered relevant DNA evidence.

Third, Mr. Morris points to the hearsay statements described above—pertaining to Doe's past romantic partner and the results of the DNA swabs—as evidence of Doe's "false testimony." *Id.* at 4-5. With respect to Doe's past romantic partner, Mr. Morris again relies on hearsay and speculation to superimpose a meaningful relationship between Doe and her past romantic partner that Doe clearly disclaimed while effectively testifying under oath in front of the hearing board. And with respect to the DNA, Doe never purported to prove to the hearing board that the DNA swabs showed Roe's DNA. Her testimony was limited to her memory of the night of October 18,

and the swab results were not in evidence. Again, the reliance on hearsay and speculative evidence that could have been elicited by Roe during or before the hearing board demonstrates an unreasonable bias against Plaintiff Doe in the appellate procedure. The same is true of Mr. Morris' reliance on statements from the same peers regarding alleged inconsistencies in Doe's statements and her general character for truthfulness. It is unclear why Roe could not elicit this evidence prior to the initial hearing or why it was only after the hearing that Roe produced such statements.

As the Complaint alleges, the underlying reason for Mr. Morris' treatment of this "new evidence" (all of which could have been adduced prior to or during the board) was Defendant CUA's fear of the reputational damage that could arise from another substantiated sexual assault on its campus. Compl. ¶¶ 52-55. A reasonable jury could find that, by arbitrarily vacating the findings of the hearing board, Defendant CUA acted in a clearly unreasonable manner and demonstrated deliberate indifference to the violent sexual assault Plaintiff Doe suffered. Defendant CUA's Motion to Dismiss correctly notes that Plaintiff Doe withdrew from CUA in the days following the appeal decision. Dkt. 13-1 at 1. But a factfinder could reasonably determine that this withdrawal reflected Plaintiff Doe's correct perception that she could not continue to participate in her education without re-living a traumatic event before an institution predisposed to disbelieve her.

Defendant CUA argues that Plaintiff "alleges absolutely nothing … as to what educational opportunities she was denied or could not access." Dkt. 13-1 at 20. CUA's intention that Plaintiff return to campus life and classes with her rapist at large—indeed still representing the university on its football team—denied her equal educational opportunities.

For these reasons, Defendant CUA's pre- and post-assault acts and omissions made Plaintiff Doe more vulnerable to sexual assault and effectively barred her from participating fully in academic life. This Court should deny Defendant CUA's Motion on these grounds.

**III. Plaintiff Doe States a Claim for Gross Negligence and Negligence *Per Se*.**

**a. Defendant CUA's breach of its duty to protect students constitutes gross negligence.**

Defendant CUA contends that Plaintiff Doe's gross negligence claim should be dismissed. Dkt. 13-1 at 30-33. However, Plaintiff Doe alleges sufficient facts that, when taken as true and viewed in the light most favorable to her, establish a plausible claim for gross negligence that should proceed to discovery and ultimately be determined by a jury. Compl. ¶ 74; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, Plaintiff Doe adequately alleges that: (1) Defendant CUA owed a duty of care to Plaintiff Doe; (2) Defendant CUA breached that duty; (3) Plaintiff Doe suffered injury; and (4) Defendant CUA's breach was the proximate cause of Plaintiff Doe's injury. *See generally* Compl.; *Bd. of Trs. of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 870 (D.C. 2009) ("It is axiomatic in torts that one can only be held liable for negligence if there was a duty, breach of that duty, and injury proximately caused by the breach."). These allegations are sufficient to state a claim and survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

First, Plaintiff Doe alleges that CUA owed a duty of care to provide reasonably safe premises and to take reasonable steps to protect students from foreseeable criminal acts, including sexual assault. Compl. ¶¶ 72, 74. This duty arises from the special relationship between universities and their students, particularly in campus settings where the university exercises significant control over the environment. Compl. ¶ 74. Although a university may hold no automatic legal duty to protect students from being assaulted by other students, a duty can arise in

certain situations. *See Doe v. Union Coll.*, No. 119-CV-284-GLS-CFH, 2020 WL 1063063, at *7 (N.D.N.Y. Mar. 5, 2020) (*citing Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 361 (N.D.N.Y. 2014)) (internal quotation marks omitted).

This special relationship and concomitant duty is especially true where, as here, Defendant CUA holds itself out as a specifically *Catholic* institution to which parents may send their daughters to be educated in a safe environment dedicated to upholding the moral teachings of the Church, including those regarding sexual relations.

For example, *Mullins v. Pine Manor College*, 449 N.E.2d 331 (1983) establishes that universities hold a duty to protect students from foreseeable criminal acts. In *Mullins*, a female student was sexually assaulted in her dormitory. *Id*. at 334. The court held that the college possessed a duty to provide reasonable security measures to protect students from foreseeable criminal acts of third parties. *Id*. at 335-36. The duty is based on two grounds: (1) the existence of a special relationship between colleges and their students, and (2) the college's voluntary assumption of a duty to protect students. *Id*. at 335-36.

Regarding the special relationship, the *Mullins* court recognized that "the concentration of young people, especially young women, on a college campus, creates favorable opportunities for criminal behavior" and "the threat of criminal acts of third parties to resident students is self-evident." *Id*. at 335. The court further noted that "students and their parents rely on colleges to provide an atmosphere that is safe from the threat of harm." *Id*.

This reasoning applies with equal force to Defendant CUA. Like Pine Manor College, CUA concentrates young students in campus housing where the threat of sexual assault is well-documented and foreseeable. *See* Compl. ¶¶ 53-54. Plaintiff Doe, like the student in *Mullins*, relied on the university to provide reasonable security measures to protect against foreseeable

criminal acts, including sexual assault facilitated by underage drinking at events affiliated with university athletic programs.

While the special relationship basis is significant, *Mullins* places equal emphasis on the voluntary assumption of duty theory. *Mullins*, 449 N.E.2d at 336. "The duty of care in this case can be grounded in another theory. It is an established principle that a duty voluntarily assumed must be performed with due care." *Id.* The court recognized that "colleges of ordinary prudence customarily exercise care to protect the well-being of their resident students" and this voluntary undertaking creates a legal duty that must be performed with reasonable care. *Id.* at 336. Colleges "generally undertake to provide their students with protection from the criminal acts of third parties" through various security measures. *Id.* And having voluntarily assumed this duty, colleges must perform it with due care. *Id.* at 337 (having undertaken to provide campus police and security, the college became obligated to use reasonable care in carrying out that duty).

The voluntary assumption of duty principle is particularly relevant here, where Defendant CUA similarly undertakes numerous security measures and safety protocols designed to protect students from foreseeable harms, including sexual harassment. Through its written policies, security protocols, residential life programs and Title IX compliance efforts, Defendant CUA voluntarily assumed duties to protect students and it must perform these duties with reasonable care. Further, the assignment of a hall monitor at university dormitories serves this precise purpose: to ensure that young students do not wind up in dangerous or compromising situations in student housing.

*Mullins* explicitly rejected the argument—similar to Defendant CUA's argument here—that universities cannot be held liable for the criminal act of third parties. Dkt. 13-1 at 30-33. The court emphasized that "the fact that a college need not police the morals of its resident

students…does not entitle it to abandon any effort to ensure their physical safety." *Mullins*, 449 N.E.2d. at 335. The court further explained that the duty of care in this case can be understood as an obligation to take reasonable measures to "protect resident students against criminal acts of third parties." *Id*. at 337.

Defendant CUA's failure to monitor drinking and drug use in its dormitories and athletics-affiliated parties, as well as its failure to enforce its rules with respect overnight stays between opposite-sex students, are exactly the circumstances in which a claim for negligence can be brought against a university that failed to adequately assist a student. That determination should be by a jury after full factual development through discovery. *Mullins*, 449 N.E.2d at 336-37 ("the question of negligence is one of fact for the jury").

Plaintiff Doe's allegations also satisfy the second element of a gross negligence claim. *Bd. of Trs. of Univ. of D.C*, 974 A.2d at 870. Plaintiff Doe alleges specific facts indicating that Defendant CUA breached its duty by failing to take reasonable measures to protect Doe, and other female freshman, such as providing training and education on how to avoid sexual assault and resolve sexual assault complaints. Compl. ¶ 74. Whether these actions constitute a breach of the standard of care is also a factual question that must be resolved by a jury. *Mullins*, 449 N.E.2d at 338 (whether the university breached its duty of care should be determined by a jury after full factual development through discovery).

As to the third element, Plaintiff Doe alleges that she suffered severe and lasting injuries as a direct result of the sexual assault that occurred on Defendant CUA's campus. These injuries include physical trauma, diagnosed post-traumatic stress disorder, severe emotional distress, academic setbacks, ongoing therapy expenses, and other psychological harm that continues to impact Plaintiff's daily functioning and educational opportunities. Compl. ¶¶ 33, 80; Dkt. 13-1 at

6 (acknowledging that Plaintiff Doe had to permanently withdraw from CUA). The Complaint details these injuries with specificity, including medical documentation that supports the severity and causation of these harms. Dkt. 4, Ex. 2. The extent and value of these injuries are factual questions properly reserved for a jury's determination.

Fourth, Plaintiff Doe alleges that Defendant CUA's breach directly and proximately caused her injuries, including physical harm, emotional distress, and other damages resulting from the sexual assault. Compl. ¶¶ 11, 74.

**b. Defendant CUA's flagrant disregard of D.C. Code § 25-781 constitutes negligence *per se*.**

In addition to the standard negligence claim, Plaintiff Doe properly stated a claim for negligence *per se* based on Defendant CUA's violations of statutory and regulatory requirements designed to protect students from sexual assault.

Under District of Columbia law, a plaintiff may establish negligence *per se* by demonstrating that: (1) the defendant violated a statute, regulation, or ordinance; (2) designed to protect a class of persons that includes the plaintiff; (3) the plaintiff belongs to that class; (4) the statute sought to prevent the type of injury the plaintiff suffered; and (5) the violation proximately caused the plaintiff's injury. *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1273 (D.C. 1987); *Jarrett v. Woodward Bros.*, 751 A.2d 972, 977 (D.C. 2000).

Here, Plaintiff Doe alleges that Defendant CUA violated D.C. Code § 25-781 by allowing the delivery of alcoholic beverages to underage and visibly intoxicated students in housing controlled by the university. Compl. ¶ 76. Plaintiff Doe properly states a negligence *per se* claim. The statute sought to protect underage and intoxicated persons from dangers associated with alcohol consumption. *Jarret*, 751 A.2d at 983-84 (internal citations omitted) ("Congress, in recent years, has exerted tremendous pressure upon states to limit the consumption of alcoholic beverages

by persons under the age of 21 ... [Alcohol,] used in excess, [] can and frequently does contribute to irresponsible actions, criminal misconduct, and serious and life-threatening physical disease. Thus, there is a clear public policy interest in establishing a more extensive regulatory scheme for the distribution of alcoholic beverages."). Plaintiff, as an underage visibly intoxicated student, clearly fell within the class this statute sought to protect. And the sexual assault suffered by Plaintiff is precisely the type of harm alcohol regulations are designed to prevent. *Id.*

Defendant CUA's failure to prevent illegal alcohol delivery on its premises set in motion the chain of events leading to Plaintiff Doe's injuries. Compl. ¶¶ 11, 74. This causal connection is sufficient to establish liability under D.C. negligence law. *See Majeska v. District of Columbia*, 812 A.2d 948, 951 (D.C. 2002) (discussing proximate cause in negligence *per se* cases); *see also Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C. 1982) (The "general rule" in this jurisdiction is that "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law.").

In response, Defendant CUA erroneously contends that it cannot be held liable under D.C. Code § 25-781 because Defendant Roe, not CUA, served Plaintiff Doe alcoholic beverages in the university-controlled housing. Dkt. No. 13-1 at 34. This argument fails—it misunderstands both premises liability principles and the scope of negligence *per se* under District of Columbia law.

Under well-established premises liability principles, property owners who control access to and activities on their premises hold a duty to take reasonable steps to prevent foreseeable illegal activities, including the service of alcohol to underage or intoxicated persons. This duty exists regardless of whether the property owner directly engages in the illegal activity or merely allows

others to do so. For example, in *Doe v. Dominion Bank*, the D.C. Circuit recognized that property owners possess a duty to take reasonable precautions to protect against foreseeable criminal acts on their premises. 963 F.2d 1552, 1560 (D.C. Cir. 1992). Similarly, in *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, the court held that "the landlord is no insurer of his tenants' safety, but he certainly is no bystander." 439 F.2d 477, 481 (D.C. Cir. 1970). This principle applies with even greater force to universities, which exercise substantial control over campus housing for underage students, and hold both the authority and responsibility to enforce alcohol regulations. The fact that another defendant physically served the alcohol does not absolve CUA of its duty to prevent such service on its property.

Next, Defendant CUA contends that the D.C. City Council did not intend for universities to be exposed to liability under the Alcoholic Beverage Control Act. Dkt. 13-1 at 34. This is incorrect. D.C. Code § 25-781 unambiguously prohibits both the sale and delivery of alcoholic beverages to underage or intoxicated persons. The statute states that "[n]o person shall... deliver, or offer to deliver an alcoholic beverage to a person under 21 years of age... [or] to any intoxicated person, or to any person who appears to be intoxicated." D.C. Code § 25-781(a), (b). The legislature's deliberate inclusion of both terms—"sell" and "deliver"—demonstrates its intent to prohibit a broad range of conduct. *Id.* Indeed, courts "examining prohibition nearly identical to [this one] have concluded that such an exactment unquestionably reflects a legislative concern for the clear dangers surrounding the sale or provision of alcohol to those who cannot safely consume it. *Rong Yao Zhou*, 534 A.2d at 1276.

Nothing in the legislative history suggests an intent to exempt universities from liability when they allow alcohol to be delivered and served to underage or intoxicated persons on their premises. To the contrary, the Council's emphasis on public safety and comprehensive regulation

supports a reading that encompasses all entities that control premises where alcohol is consumed. *Jarret*, 751 A.2d at 984 ("The history of legislative amendments to the ABC Act thus shows the legislature's broadening concern from morality and public order, to safety concerns resulting from drunk driving by those under twenty-one years of age, to the dangers to the safety and health of those who consume alcohol, particularly those who abuse it and those who are underage.").

Moreover, courts in this jurisdiction consistently reject attempts to narrowly construe alcohol liability statutes. In *Jarrett*, the D.C. Court of Appeals emphasized that alcohol regulations should be interpreted broadly to fulfill their protective purpose. 751 A.2d at 978. Similarly, in *Rong Yao Zhou*, the court recognized that liability extends beyond the direct server of alcohol to those who control the premises where illegal alcohol consumption occurs. 534 A.2d at 1275 (although "the facts before us involve accidental injuries resulting from a motor vehicle accident, a similar analysis would be appropriate for other types of accidental injuries associated with the excessive consumption of alcohol.").

Defendant CUA ignores these cases and their underlying rationale: that those able to prevent illegal alcohol consumption and resulting injuries possess a duty to do so. This rationale applies with at least equal force to universities, which exercise substantial control over campus premises full of underage young adults and hold the authority and responsibility to enforce alcohol regulations. Under CUA's interpretation, a bar that sells alcohol to an underage person would face liability, but a university that knowingly allows alcohol to be delivered to underage students on its premises, resulting in excessive drinking and sexual assault, would not—even though both entities control the premises and are the able to prevent illegal and excessive alcohol consumption.

This distinction makes little sense from a policy perspective and would undermine the statute's protective purpose. The harm resulting from underage or excessive drinking is the same

regardless of whether the alcohol is served directly by Defendant Roe or CUA staff. Indeed, the risks are even greater in settings like university dormitories, where supervision is often less rigorous than in licensed establishments.

For the foregoing reasons, Plaintiff Doe respectfully requests that this Court deny Defendant CUA's Motion to Dismiss. Plaintiff Doe adequately alleged all elements of her negligence *per se* claim based on D.C. Code § 25-781, and any factual questions regarding CUA's knowledge, control and breach of duty should be resolved through discovery and trial, not at the pleading stage.

## CONCLUSION

Defendant CUA showed pre-assault deliberate indifference under Title IX to past rapes by the university's male athletes of inebriated freshman women. Defendant subsequently showed post-assault deliberate indifference by vacating its Title IX board's finding, solidly based on evidence including photographs of Plaintiff's injuries and outcry witnesses' testimony, that Defendant Roe raped Plaintiff. CUA reversed its board's decision substantially on the basis of hearsay testimony that Plaintiff had sex with another man four days before Roe's assault upon her, and an illogical theory that bruises from the earlier encounter appeared only after Plaintiff's encounter with Roe. By ignoring its own regulations about underage drinking and overnight dormitory visits, Defendant failed with gross negligence in its special duty to provide a safe environment in which young women might receive a Catholic education, and displayed negligence *per se* in allowing alcohol to be delivered to intoxicated, underaged students on its property.

Plaintiff Doe respectfully requests that this Court deny Defendant CUA's Motion to Dismiss with respect to all claims.

Dated: November 25, 2025

Respectfully submitted,

*<u>/s/ Kevin T. Carroll</u>*
Kevin T. Carroll, DC Bar No. 1021479
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kcarroll@fluet.law
e-file@fluet.law

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 25, 2025, I caused the foregoing to be served on all counsel of record for the Defendants via CM/ECF.

*/s/ Kevin T. Carroll*
Kevin T. Carroll, Esq.