**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANE DOE,

Plaintiff,

v.

JOHN ROE, *et al.*,

Defendants.

Civil Case No. 25-2978 (RJL)

**MEMORANDUM OPINION**
(September 24, 2026) [Dkt. #13]

Jane Doe ("plaintiff" or "Jane") alleges that fellow Catholic University of America student John Roe ("John") sexually assaulted her in October 2024. *See* Am. Compl. [Dkt. #11]. Jane brings assault and battery claims against John and, separately, asserts four claims against defendant Catholic University of America ("the University") arising from the University's alleged handling of the assault. *Id.* Specifically, she asserts two claims under Title IX for pre-assault deliberate indifference (Count I) and post-assault deliberate indifference (Count II), as well as tort claims for gross negligence (Count III) and negligence *per se* (Count IV).

The University now moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the four claims for failure to state a claim upon which relief may be granted. *See* Def.'s Mot. to Dismiss ("Def.'s Mot.") [Dkt. #13]. Accepting Jane's well-pleaded factual

allegations as true, I find that the Amended Complaint plausibly states a Title IX claim based on the University's alleged post-assault deliberate indifference. Her allegations, however, do not state viable claims for pre-assault deliberate indifference, gross negligence, or negligence *per se*. Accordingly, I will **GRANT** the University's motion to dismiss Counts I, III, and IV and **DENY** the motion as to Count II.

## BACKGROUND

### I. Alleged Assault

Jane Doe was a freshman at the Catholic University of America in fall 2024. Am. Compl. ¶ 1. She met defendant John Roe, another freshman student and a member of the football team, when John reached out via social media to invite her to a party. *Id.* ¶ 19. On October 18, 2024, Jane consumed several alcoholic drinks in her dorm room and then met John at the "rugby house" around 11:00 PM. *Id.* ¶ 20. John and Jane had several additional drinks before John escorted Jane to his dorm room. *Id.* ¶ 21. Jane claims that once she entered John's dorm room, John kissed her without consent. *Id.* ¶ 23. John then allegedly pinned Jane down on his bed, strangled her, and removed her clothes. *Id.* ¶ 25. Jane claims she "was unable to breathe, move, speak, or swallow," and that John raped and sodomized her.[1] *Id.* ¶¶ 25–26. John asked Jane to stay the night, which she declined. *Id.* ¶ 27.

Jane then walked back to her dormitory and told six people about the assault: her friends Oceane Regis and Rosary Tambunan, her sister and mother, her resident advisor

[1] John, the other defendant in this case, refutes these facts. *See* Answer [Dkt. #17]. However, "[i]n evaluating a Rule 12(b)(6) motion, [we] must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *KLEO AG v. Rivada Networks, Inc.*, 148 F.4th 741, 745 (D.C. Cir. 2025) (internal quotation marks omitted).

and community director. *Id.* ¶ 28. Jane also blocked John on social media after he messaged her asking, "Are you good?" *Id.* ¶ 30. On October 20, 2024, she underwent an examination by a sexual assault nurse examiner ("SANE"). *Id.* ¶ 31.

## II. Initial Response, Investigation, and Hearing

On October 20, 2024, the University issued a "no-contact" order, prohibiting John from engaging with Jane. *See* Ex. B to Def.'s Mot., Title IX Decision on Appeal ("Appeals Decision") [Dkt. #13-3] at 6 n.3. On October 25, 2024, Jane filed a formal complaint against John. *See* Ex. A to Def.'s Mot., Title IX Hr'g Board's Determination of Responsibility Mem. ("Determination Mem.") [Dkt. #13-2] at 2. On the same day, the University notified John of the complaint and initiated the investigation process. *Id.* The University interviewed witnesses and examined messages, photographs, and medical records. *Id.* Jane and John also submitted expert witness reports, and Jane submitted letters from University instructors, her mother, and her sister attesting to her character. *Id.*

The University held a Title IX hearing on February 24, 2025. Determination Mem. at 2. At the conclusion of the hearing, the Hearing Board found John responsible for sexual assault and recommended expulsion. *Id.* In reaching its decision, the Hearing Board referred to photos taken by Jane's mother which showed significant bruising on Jane's neck. *Id.* at 4. The Hearing Board noted that "[a]t the time of the hearing, the rape kit results [from the SANE exam] were not available for review," but that the photographs and medical records effectively served as "compelling evidence that a traumatic event resulting in physical injury had occurred on the morning of October 19, 2024." *Id.* The Hearing Board also found Jane's "immediate" outcry testimony to numerous witnesses to be "the

most influential evidence in this case." *Id.*

The Hearing Board did not find John's testimony to be credible. *See* Determination Mem. at 5. The Board questioned his account of the events and his claim that Jane did not have any bruising on her neck when she left. *Id.* The Hearing Board also "drew a negative inference" from the fact that John's father did not submit a character reference on his son's behalf. *Id.*

## III. Appeal of Hearing Board's Decision

John appealed the Hearing Board's decision. *See* Appeals Decision at 2. Lawrence Morris ("Morris"), the University's Chief of Staff, considered the appeal pursuant to the University's Title IX Grievance Procedures. *Id.*; *see also* Ex. D to Def.'s Mot., Title IX Grievance Procedures ("Grievance Procedures") [Dkt. #13-5] at 14–15. There are three bases under which the Chief of Staff may overturn a Hearing Board decision: (1) a finding of "procedural irregularity that affected the outcome of the matter;" (2) "new evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter;" and (3) "[e]vidence showing a Title IX Coordinator, investigator, or decision-maker had a conflict of interest or bias." Title IX Grievance Procedures at 14. John appealed on all three grounds. *See* Appeals Decision at 1.

Morris granted John's appeal, finding both new evidence and a procedural irregularity affected the outcome of the matter. *Id.* Regarding the new evidence, Morris noted that Jane had sexual intercourse with an abusive ex-boyfriend several days before the alleged attack, which "calls into question" that Jane's injuries were caused by John. *Id.*

at 3. Morris also cited new medical evidence from the SANE exam, and evidence of Jane's "false testimony" during the original Hearing Board. *Id.* at 3–5. Morris pointed to statements from Jane's friends Rosary Tambunan, Celeste Hurtado, and "E.B.," that suggested Jane's recollections of the assault were inconsistent. *Id.* at 5. According to Morris, this evidence was not "reasonably available" to John during the investigation because John "had no reasonable expectation" that Jane's friends "had exculpatory information or that they would share" the information with him. *Id.* at 6.

Regarding the procedural irregularity, Morris took issue with the Hearing Board's decision to draw a "negative inference from the absence of a character reference from [John's] father." Appeals Decision at 6. Morris explained that character witnesses are permitted but not required, and that John's father would have provided a character reference "but for his attorney's advice." *Id.* at 7. Morris described the negative inference as a "procedural irregularity that was of such weight to have affected the outcome of the matter." *Id.*

Morris issued his decision on March 24, 2025. Appeals Decision at 1. He elected to return the case to a "new Hearing Board to consider evidence and responsibility," and referred the case "to the Dean of Students for additional proceedings consistent with this opinion." *Id.* at 11. On March 25, 2025, Jane withdrew from the University and declined to participate in further Title IX proceedings. *See* Ex. E to Def.'s Mot., Withdrawal Acknowledgement Letter [Dkt. #13-6] at 1.

## IV. Current Suit

Jane filed this action against John Roe and the University on September 2, 2025.

*See* Compl. [Dkt. #1]. Jane later moved for leave to correct her complaint, the Court granted that request, *see* Min. Order (Oct. 15, 2025), and Jane filed the operative Amended Complaint, *see* Am. Compl. Against the University, Jane alleges two claims under Title IX for "pre-assault deliberate indifference" (Count I) and "post-assault deliberate indifference" (Count II), as well as District of Columbia claims for gross negligence (Count III) and negligence *per se* (Count IV). *See* Am. Compl. ¶¶ 68–69, 70–72, 73–74, 75–76. The University moves under Rule 12(b)(6) to dismiss the four claims for failure to state a claim. *See* Def.'s Mot. Jane opposes the motion, which is now ripe for review. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") [Dkt. #16].

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim upon which relief can be granted." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *id.* at 555, "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Though a plaintiff may survive a Rule 12(b)(6) motion even if "'recovery is very remote and unlikely,'" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56.

## <u>ANALYSIS</u>

### I. Title IX Claims

"Title IX seeks to eliminate sex-based discrimination in education programs that

receive federal funds." *Doe v. Columbia*, 151 F.4th 435, 445 (D.C. Cir. 2025). The statute provides that, "[n]o person in the United States shall, on the basis of sex . . . be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). An individual may enforce this provision against federally funded universities. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). While a university is generally not liable for torts committed by students, "in certain limited circumstances," a university may be held liable for its own deliberate indifference to known acts of sexual harassment committed by one student against another. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).

**a. Pre-Assault Deliberate Indifference**

Plaintiff claims the University is liable for "pre-assault deliberate indifference" because it "had actual knowledge prior to Plaintiff's rape that its policies and procedures, as implemented, made female students vulnerable to on-campus rapes," particularly by older male athletes. Am. Compl. ¶ 69. Unfortunately, plaintiff does not meet Title IX's demanding "actual knowledge" threshold for a pre-assault deliberate indifference claim.

Pre-assault deliberate indifference claims are cognizable under Title IX, but only in limited circumstances. *See, e.g., Raihan v. George Washington Univ.*, 324 F. Supp. 3d 102, 109 (D.D.C. 2018). The plaintiff must plausibly allege that an appropriate university official had "actual knowledge" of a concrete risk of sexual harassment in a setting under the university's control and responded with deliberate indifference. *See Gebser*, 524 U.S. at 290.

While our Circuit has not addressed the circumstances under which a university's "pre-assault" conduct may satisfy Title IX's actual knowledge requirement, two prominent out-of-circuit decisions illustrate the notice required to state such a claim. In *Simpson v. University of Colorado Boulder* and *Williams v. Board of Regents of University System of Georgia*, the alleged risks were highly specific and known to responsible university officials before the plaintiffs' assaults. In *Simpson*, the university allegedly knew that sexual assaults had occurred in connection with its football-recruiting program, where female students were encouraged to show recruits a "good time," and nevertheless continued that defined program without meaningful safeguards. *Simpson*, 500 F.3d 1170, 1184–85 (10th Cir. 2007). In *Williams*, officials allegedly admitted and housed a student athlete despite knowing of his serious prior sexual misconduct at other schools, thereby disregarding a known risk posed by an identified student. *Williams*, 477 F.3d 1282, 1295 (11th Cir. 2007). Together, these cases establish that "actual knowledge" may be plausibly alleged where an institution is on notice of recurring sexual misconduct within a specific program, or of a particular student's known propensity for such misconduct.

The only decision in this district to consider a pre-assault deliberate indifference claim marks the other side of that line. In *Raihan v. George Washington University*, the plaintiff alleged that the University failed to implement sexual assault reforms that it had adopted following a federal investigation. 324 F. Supp. 3d at 111. The court concluded that such allegations of institutional shortcomings did not establish actual knowledge. *Id.* at 110. In other words, broad notice of campus sexual assault and alleged failures in response systems do not, without more, establish that a university actually knew of a risk

that would make a student vulnerable to assault.

Here, plaintiff's allegations are more analogous to those found in *Raihan* than to the particularized allegations at issue in *Simpson* and *Williams*. Plaintiff does not allege that the University knew John had a history of sexual misconduct, *see Williams*, 477 F. 3d at 1294, or identify a discrete University program analogous to the recruiting program in *Simpson* that had several known prior assaults in the same setting, *Simpson,* 500 F.3d at 1181. Instead, plaintiff alleges generally that the University "suffers from a pattern and practice of older male athletes raping female freshmen students too intoxicated to consent to sex after alcohol-fueled parties on University property." Am. Compl. ¶ 69. That allegation is insufficient to plausibly establish actual knowledge.[2]

**b. Post-Assault Deliberate Indifference**

Plaintiff's second Title IX claim concerns the University's response to the alleged assault, and, in particular, Chief of Staff Lawrence Morris's decision to vacate the Hearing Board's decision. Plaintiff alleges that Morris displaced the Hearing Board's credibility and responsibility determinations by arbitrarily crediting unreliable material. *See* Am. Compl. ¶¶ 71–72; Pl.'s Opp'n at 8. At this stage, I find that these allegations plausibly state a claim that the University responded to known sexual harassment with deliberate indifference.

[2] Plaintiff refers to two previous sexual assaults involving Catholic University: *Latham v. Catholic Univ.*, No. 1:08-cv-1852 (D.D.C.), and *Cavalier v. Catholic Univ.*, No. 1:16-cv-2009 (D.D.C.). *See* Pl.'s Opp'n at 4–5. Those references, however, do not support an inference that the University had notice of the particular risk alleged here. Plaintiff does not allege that either matter involved John, the "rugby house," the same University personnel, or a continuing practice that created the risk Jane faced in October 2024. Two incidents do not plausibly establish that the University had actual knowledge that John, or an identifiable University practice, posed a risk to plaintiff.

Generally, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Doe v. Am. Univ.*, 2020 WL 5593909, at *16 (D.D.C. Sept. 18, 2020) (quoting *Plummer v. Univ. of Hous.*, 860 F.3d 767, 772 (5th Cir. 2017)). However, courts *may* find that an institution acted with deliberate indifference when its response to an incident is clearly unreasonable under the circumstances. *See, e.g., Cavalier v. Catholic Univ. of Am.*, 513 F. Supp. 3d 30, 51 (D.D.C. 2021).

Plaintiff plausibly claims that much of the material Morris characterized as "new" predated the February 2025 hearing and was available to John, including evidence concerning plaintiff's prior relationship, possible alternative causes of her injuries, the SANE examination, and asserted inconsistencies in her account. *See* Am. Compl. ¶ 42; Pl.'s Opp'n at 11. Whether that evidence was genuinely unavailable cannot be resolved against plaintiff at the pleading stage. Indeed, if it was not genuinely new, Morris's ruling could be understood as allowing John a "second bite at the apple" after an adverse finding. Pl.'s Opp'n at 9.

Plaintiff also plausibly alleges that Morris drew unsupported adverse credibility inferences from that evidence. Morris relied in part on plaintiff's prior sexual relationship and allegations of past abuse by another partner as alternative explanations for her injuries. Appeals Decision at 2–3. Yet the Amended Complaint alleges that the Hearing Board considered photographs of bruising on plaintiff's neck taken immediately after the incident, contemporaneous medical records, and testimony from outcry witnesses, and that Morris identified no evidence connecting the purported prior events to the particular injuries

documented after the alleged assault. Am. Compl. ¶ 40; Determination Mem. at 4. Taken as true, those allegations support an inference that Morris used speculative material to overturn the Board's credibility determinations.

The alleged procedural irregularity provides further support for plaintiff's claim. Morris concluded that the initial Board's adverse inference from the absence of a character reference from John's father may have affected the result. Appeals Decision at 6–7. Plaintiff alleges, however, that character evidence was optional and that John chose not to submit his father's statement on advice of counsel. Am. Compl. ¶ 51. She further alleges that Morris treated this discrete issue as sufficient to vacate a decision otherwise grounded in physical evidence, medical documentation, and the Board's credibility findings. *Id.* ¶ 6. I need not decide whether Morris correctly assessed that issue. It is enough that plaintiff plausibly alleges Morris' treatment was disproportionate and selectively favorable to John.

Taken together, the allegations describe more than mere dissatisfaction with the outcome of a campus proceeding. Plaintiff alleges that a senior University official set aside a completed responsibility finding based on purportedly new evidence that may have been previously obtainable; used speculative material to undermine her credibility; and required her to undergo another contested hearing after the University had initially credited her account and expelled John.[3] A reasonable factfinder could conclude that this process was

[3] The University correctly notes that Morris did not exonerate John, but instead ordered a new hearing. *See* Appeals Decision at 11. That fact may ultimately weigh in the University's favor. It is not, however, dispositive at this stage. Plaintiff alleges that the ruling vacated John's expulsion, permitted him to remain on campus, and placed her in the position of either returning to a campus where her alleged assailant remained or participating in a second adversarial hearing to obtain relief. *See* Pl.'s Opp'n at 11. She withdrew from the University the following day and declined to continue in the Title IX process. *Id.* These allegations plausibly establish a connection between the appeal decision and her asserted loss of equal access to educational opportunities.

arbitrary and one sided.

Plaintiff must ultimately prove that Morris's decision was "clearly unreasonable," and that it caused her educational harm. *Raihan*, 324 F. Supp. 3d at 112. That showing may be difficult, particularly given the University's no-contact order, investigation, and initial expulsion of John. *See* Determination Mem. at 2. But those issues require a developed factual record. At the motion to dismiss phase, "the court's responsibility is limited to deciding whether the complaint contains any factual allegations sufficient to support the reasonable inference that the [University] is liable for the misconduct alleged." *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 136 (D.D.C. 2019) (internal quotation marks omitted). Here, plaintiff has alleged sufficient facts to support a finding that the University's reversal of John's expulsion was clearly unreasonable.

**II. Gross Negligence**

Plaintiff next claims that the University created a dangerous campus environment and failed to take reasonable steps to protect female students from sexual assault by University athletes. Am. Compl. ¶ 74. Plaintiff alleges that the University owed her a duty to provide safe premises, and that this duty arises from both an asserted "special relationship" between the University and its students and the doctrines of *res ipsa loquitur* and *in loco parentis*. *Id.* However, neither theory states a viable claim for gross negligence.

To establish negligence under D.C. law, "a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Sigmund v. Starwood Urb. Retail VI, LLC*, 617 F.3d 512, 514 (D.C. Cir. 2010). Gross negligence, in turn, requires,

"an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *Atkinson v. D.C.*, 281 A.3d 568, 571 (D.C. 2022). "[T]he question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008).

Plaintiff has not plausibly alleged that the University owed a tort duty independent of its contractual relationship with plaintiff as a student. Under D.C. law, "the relationship between a university and its students is contractual in nature," *Chenari v. George Washington Univ.*, 172 F. Supp. 3d 38, 47 (D.D.C. 2016), and a tort claim between contracting parties "must stand as a tort even if the contractual relationship did not exist," *Bloom v. PNC Bank, N.A.*, 659 F. Supp. 3d 27, 32 (D.D.C. 2023). The asserted duties, namely "to properly warn, train, and educate University students and staff how to avoid sexual assault, and if necessary, to fairly resolve sexual assault complaints," Am. Compl. ¶ 74, arise from the services the University provides to its students. Plaintiff identifies no separate common law duty to protect her from John's alleged criminal conduct.

Nor do the allegations establish a "special relationship" that would give rise to such a duty. *See Sibley v. St. Albans School*, 134 A.3d 789, 798 (D.C. 2016) (noting that "[t]he relationship between a student and his school . . . is not enough, without more, to impose the predicate duty of care" for a negligence claim). The University does not owe a blanket duty of care to adult students merely because it operates residence halls, provides security and safety policies, or maintains Title IX procedures. Plaintiff does not allege that the

University knew John had committed prior misconduct or had notice of an immediate risk on the night of the alleged assault. *Cf. Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 40 (D.D.C. 2018) (concluding that a special relationship could arise where the university affirmatively undertook to protect a student by repeatedly assuring her that a no-contact order was in place and that it would enforce the order upon notice of violations). The generalized allegation of misconduct by older male athletes at parties does not establish the presence of any "special relationship."

Neither *res ipsa loquitur* nor *in loco parentis* supplies the missing duty. "Res ipsa loquitur permits a jury to infer negligence from the mere occurrence of the accident," and may only be invoked if the undisputed facts establish: "(1) the accident is of a kind that ordinarily does not occur without negligence; (2) the instrumentality causing the injury was within the defendant's exclusive control; and (3) the plaintiff did not contribute to or cause the accident." *Nixon v. Ippolito*, 320 A.3d 1059, 1070 (D.C. 2024). That doctrine does not apply here: the alleged assault was committed by John, a third party whose conduct was not within the University's exclusive control, and the mere occurrence of the alleged assault does not, without more, support an inference of negligence by the University. Nor does the University's enrollment of students, or its receipt of tuition, place it *in loco parentis* with plaintiff. Plaintiff identifies no authority from our Circuit recognizing an *in loco parentis* relationship between a university and its students, and courts elsewhere have rejected the premise that a college's provision of housing gives rise to such a relationship. *See, e.g.*, *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 245 (3rd Cir. 2010) ("The idea that public universities exercise strict control over students via an *in loco parentis* relationship

has decayed to the point of irrelevance.").

## III. Negligence *Per Se*

Plaintiff's final claim alleges negligence *per se* based on the University's purported violation of D.C. Code § 25-781. Am. Compl. ¶ 76. That provision prohibits the "sale or delivery of alcoholic beverages" to a "person under 21 years of age" or "[a]n intoxicated person." D.C. Code §§ 25-781(a)(1), (a)(2). Because plaintiff has not plausibly alleged that the University violated that statute, I will dismiss Count IV.

"Under District of Columbia law, the [v]iolation of a statute or regulation may constitute negligence *per se* only (1) if the statute is meant to promote safety; (2) if the plaintiff is a member of the class to be protected by the statute; and (3) if the defendant is a person upon whom the statute imposes specific duties." *Goodwin v. D.C.*, 579 F. Supp. 3d 159, 175 (D.D.C. 2022) (internal quotation marks omitted). Even assuming that plaintiff satisfies the first two requirements because she was underage and the statute was enacted to protect persons in her position, she has not plausibly alleged that the University is among the persons of whom the statute imposes specific duties. *See, e.g., Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1040 (D.C. 2014) (finding a *nightclub* could potentially be held liable under D.C. Code § 25-781); *Doe v. De Amigos, LLC*, 2014 WL 12785495, at *2 (D.D.C. Jan. 23, 2014) (same).

Moreover, plaintiff does not allege that any University employee or agent sold or delivered alcohol. Jane consumed alcohol in her own room, and then she and John consumed alcohol together at the rugby house and later in his dorm room. Am. Compl. ¶¶ 18, 20–22. Those allegations identify John, not the University, as the person who supplied

alcohol to Jane. Plaintiff's assertion that the University controlled the premises does not establish a statutory violation. D.C. Code § 25-781 prohibits the sale or delivery of alcohol; it does not impose on every property owner a statutory duty to prevent all underage drinking by students on its property. Plaintiff does not allege that the University operated or hosted the gathering, authorized alcohol service, or knowingly permitted John to provide alcohol to Jane while she was underage or visibly intoxicated.[4] Accordingly, plaintiff has not plausibly alleged that the University violated D.C. Code § 25-781, and I will grant the University's motion to dismiss Count IV.

## CONCLUSION

For all the reasons stated above, it is hereby **ORDERED** that defendant's Motion to Dismiss [Dkt. #13] is **GRANTED IN PART** and **DENIED IN PART**. An accompanying Order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge

[4] The cases plaintiff cites concerning a property owner's common law obligation to take reasonable precautions against foreseeable third party misconduct do not alter this conclusion. *See Doe v. Dominion Bank*, 963 F.2d 1552, 1559 (D.C. Cir. 1992) (discussing the duties of a commercial landlord); *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477, 481 (D.C. Cir. 1970) (same). Those common law premises liability principles do not establish that the *University* violated a duty specifically imposed by D.C. Code § 25-781. A generalized duty to take reasonable precautions on one's property does not transform the University into the "seller" or "deliverer" of alcohol for purposes of that statute.